CONSTRUCTORS ASSOCIATION OF
WESTERN PENNSYLVANIA,
Plaintiff,

v.

Juanita KREPS, Secretary of Commerce
of the United States of America, Milton
J. Shapp, Governor of the Common-
wealth of Pennsylvania, and Richard
Caliguiri, Mayor of the City of Pitts-
burgh, Defendants.

Civ. A. No. 77–1035.

United States District Court,
W. D. Pennsylvania.

Oct. 13, 1977.

938

Charles R. Volk, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiff.

Deborah M. Seymour, Dept. of Justice, Washington, D. C., David B. Atkins, Jr., Asst. U. S. Atty., Pittsburgh, Pa., for Secretary of Commerce.

Eugene B. Strassburger, City of Pittsburgh Law Dept., Pittsburgh, Pa., for Richard Caliguiri.

Michael Louik, Pa. Dept. of Justice, Pittsburgh, Pa., for Milton Shapp.

## OPINION

SNYDER, District Judge.

The Constructors Association of Western Pennsylvania[1] (the Association) has brought an action for declaratory judgment and injunctive relief to prevent the Secretary of Commerce of the United States from conditioning the contracting of public works projects on 10% minority business enterprise participation, and for an injunction against the City of Pittsburgh (City) and the Commonwealth of Pennsylvania (Commonwealth), as recipients of public works financing to prevent their advertising, seeking of bids, or awarding of contracts based on such minority business enterprise participation (MBE). Presently before the Court is the Plaintiff's Motion for Preliminary Injunction.

The Defendants move for judgment on the basis that the Plaintiff is premature in its action, lacks standing and is guilty of laches. This Motion will be denied.

■ The Association contends that its members will be denied their Fifth Amendment equal protection rights[2] by virtue of the MBE provision of the Public Works Employment Act (PWE) in that (1) PWE cannot survive the tests of strict scrutiny of the suspect classification based upon racial origin, and (2) that under any standard of review, this quota system is invidiously violative of equal protection, for racial and ethnic quotas are constitutionally impermis-

sible, and (3) crude racial and ethnic quotas may not be used in the allocation of scarce economic resources. In all these respects, we find against the contentions raised by the Association, and the preliminary injunction will be denied.

## I. THE LEGISLATIVE HISTORY.

The Local Public Works Act (LPW) became law on July 22, 1976 and Congress appropriated two billion dollars for its implementation (Pub.L. 94–447). The program was to be administered by the Secretary of Commerce through the Economic Development Administration (EDA) which distributes funds under LPW to State and local governments for public works projects. Grantees are required to contract project construction work to the private sector through competitive bidding (Sections 102–106; 42 U.S.C. 6701–6705). From October 26, 1976, to February 9, 1977, EDA processed, approved and denied applications from State and local governments for assistance under LPW. This period, referred to as "Round I", resulted in the final approval of approximately two thousand projects.

Before EDA had completed the processing of projects under Round I, bills were introduced in the U.S. House of Representatives (H.R. 11, January 11, 1977) and in the U.S. Senate (Senate No. 427, January 25, 1977) to provide additional funding under LPW. The Public Works Employment Act of 1977 (PWE) became law on May 13, 1977,

---

1. The Association is a nonprofit organization whose membership consists of general contractors and subcontractors in 33 counties in Western Pennsylvania engaged in heavy and highway construction. Association Firms have been awarded 40.9% of the heavy and highway work with the City of Pittsburgh in 1975, and 86% of such work in 1976. Of the heavy and highway construction conducted by the Pennsylvania Department of Transportation in the 33 Western Pennsylvania counties, 74% went to Association Members in 1975 and 56% in 1976.

2. Although the Fifth Amendment contains no equal protection clause, the due process clause contains an equal protection element, proscribing racial discrimination to the same extent as

Fourteenth Amendment equal protection guarantees. This was most recently affirmed by the Supreme Court in *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597, 607 (1976), an action brought under Fifth Amendment due process. Justice White said:
    "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups, *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, 53 Ohio Ops. 331 (1954)."
See text, *infra* 946–947.

authorizing an additional four billion dollar appropriation for a "Round II" program. By amendment to Section 103, it was provided:

"2. Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term 'minority business enterprise' means a business at least 50 per centum of which is owned by minority group members or, in case of publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos and Aleuts."

The Report of the Committee on Public Works and Transportation of the House of Representatives which accompanied the authorization for Round I (Report No. 94–1077, 94th Cong., 2nd Sess., at 2) states that LPW "has a two-fold purpose: (1) to alleviate the problem of nationwide unemployment, and (2) to stimulate the national economy by assisting State and local governments to build badly needed public facilities." Furthermore, Congress made explicit its intent to have the public facilities project funded and commenced quickly, saying:

"The bill is carefully and expressly designed to avoid the long lag time sometimes associated with public works programs. . . . To be eligible for a grant, the project must be started within 90 days of its approval if federal funds are available. The bill also provides that applications must be acted upon by the administrative agency within 60 days of the date of its receipt." (Id. at 3).

Speedy action by EDA was assured under Section 107 (42 U.S.C. § 6706) which provided:

"Failure to make such final determination within such period (60 days) shall be deemed to mean approval by the Secretary of the grant requested."

The Section further required that regulations to implement the Act be issued within 30 days of its enactment.

On December 23, 1976, EDA published a list of 1988 projects which had been provisionally selected for funding under Round I (41 Fed.Reg. 56146). By February 9, 1977, final project processing had been completed, approximately 2,000 were approved, and 23,500 rejected applicants had requested, in the aggregate, approximately 21.8 billion dollars.

The 1977 Amendments effectuated by PWE not only extended the program but were also designed to resolve problems encountered in Round I, see Report of the Committee on Public Works and Transportation, U.S. House of Representatives, House Report 95–20, 95th Cong., 1st Sess., at 3 (1977), U.S.Code Cong. & Admin.News 1977, p. 150. The Senate version, Report of the Commission on Environment and Public Works, No. 95–38, 95th Cong., 1st Sess., at 2–3 (1977), included changes "in order to target federal assistance more accurately and in the areas of greatest need", stating:

". . . (there was) need for the public works program and for increased Federal funding. There was unanimous agreement that the program, properly directed, would be a significant factor in the attack on unemployment. Furthermore, they (the witnesses) noted the lasting contribution that would be made to the economic stability and well-being of communities all over America through their public works projects." (at 2).

The House Report justified the LPW program as follows:

"Unemployment levels, particularly in the construction industry, remain at unacceptable levels. Economic recovery is still weak nationally, exacerbated further by the severe winter with layoffs and shortages of fuel. The lagging recovery

limits the capability of local governments to carry out normal programs of capital expenditure for needed facilities. State and local government outlays for new construction for the 10-year period since 1967 have actually dropped in volume from $30.8 billion to $22 billion (using 1972 dollars). Continuation of the public works employment program will provide additional stimulus to the sluggish economy." (at 1–2).

PWE was enacted May 13, 1977, and EDA was required to establish and issue regulations and procedures to process (approve or deny) thousands of applications by September 30, 1977, the deadline on the expenditure of the 4 billion dollars appropriated for Round II. Further, to insure speedy implementation of Round II, Section 108(h)(1) (42 U.S.C. 6707(h)(1)) stated that unless otherwise provided, the Secretary was not to consider, or approve, or make a grant for any project on which the application had not been submitted on or before December 23, 1976. Finally, under Section 106(d), grantees were required to commence construction within 90 days of project approval.

■ The MBE requirement, added to the legislation during the floor debate in the House on February 24, 1977 (123 Cong.Rec. daily ed. at 1441) and later set forth in the Senate (123 Cong.Rec. daily ed. 3910, March 10, 1977), was intended to remedy a deficiency in the 1976 Act whereby "minority businesses received only one per cent of the federal contract dollar despite repeated legislation, executive order and regulations mandating affirmative efforts to include minority contractors in the federal contracts pool." 123 Cong.Rec.S., *supra*, at 3910. Thus, the amendment was designed to serve a remedial purpose additional to and separate from the primary purpose of reducing unemployment. It was to boost the participation of minority businesses in the grant funds.

The Secretary of Commerce has, in accordance with the authority granted in Section 107, promulgated Regulations (13 C.F.R. 317.19(b)); 42 F.Reg. 27434–27435 (May 27, 1977) under this MBE provision, providing:

"(b) . . . (1) No grant shall be made under this part for any project unless at least 10 per cent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.

(2) The restriction contained in paragraph 1 of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten per cent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or the supplies intended to be procured."

In addition, on June 6, 1977, the Commerce Department issued Guidelines for Round II (Department Guidelines) in which, in addition to calling for 10% MBE participation, also provided:

"(b) The applicant/grantee will have the right to request a partial or total waiver of this requirement. This waiver request may be made either at the time of resubmission of the project or subsequent to project approval. The applicant must provide a statement of justification in support of its request for waiver. This statement must consider the following:

The size of the minority population in the project area;

The availability of minority enterprise in the reasonable trade area from which contractors, subcontractors, and suppliers will be drawn for the project;

The efforts of the grantee and prime contractors have exerted to enlist minority firms; and

Any other relevant facts.

The Regional Director will make the final determination as to whether the waiver will be granted."

In August of 1977, EDA issued a supplemental *"Guidelines for 10% Minority Business Participation in L P W Grants"* (EDA Guidelines) for the implementation of PWE. These EDA Guidelines contemplated that

grantees are primarily responsible for assuring compliance in attempting to locate and involve minority enterprises in the grant project. They require that "every Grantee should make sure that it knows the names, addresses and qualifications of all relevant MBEs", and point out that the Office of Minority Business Enterprises (OMBE) in the Department of Commerce and the Small Business Administration (SBA) are prepared to assist grantees and prime contractors in fulfilling the MBE goals (EDA Guidelines at 4).

In the case of projects to be administered by one prime contractor, "the 10% MBE requirement would be met if the prime contractor is an MBE, or if at least 10% of the grant funds are expended for MBE subcontractors or suppliers". (EDA Guidelines at 7). Where more than one contractor is involved, "(s)ome of the contractors may themselves be MBEs—for example, contracts for engineering or other professional or supervising services or for landscaping, accounting, or guard services. Some prime contracts may be with MBEs or may contain assurances for 10% MBE participation or for more than 10% MBE participation, with appropriate supporting names and addresses of MBE subcontractors or suppliers. Other prime contracts may provide for less than 10% MBE participation". (EDA Guidelines at 9).

Compliance with the requirements are monitored at the federal level through reporting provisions. The grantee itself must monitor the performance of its prime contractor. If shortfalls occur, EDA can suspend the first letter of credit, or refuse to issue a second letter of credit, or, in extreme cases, terminate the grant unless the grantee demonstrates that the shortfalls are not its fault or the fault of its prime contractor, or unless the grantee can demonstrate that the shortfalls will be made up during the remainder of the contract. (EDA Guidelines at 6–7).

The waiver process is detailed in these EDA Guidelines (at 13–16). If the availability of qualified MBEs is insufficient in the market area as therein defined, waiver may be sought by the grantee on a project-by-project basis from the EDA Regional Director. Although such waiver will ordinarily be entertained only after the grantee and prime contractors have taken all necessary steps to enlist MBEs (i. e., after bidding or negotiation), in exceptional circumstances it may be considered before bidding (EDA Guidelines at 14–15). The grantee must detail efforts to enlist minority participation and list specific minority businesses contacted and state why they were not used. (EDA Guidelines at 14). The Guidelines define "qualified" as able to "perform the services or supply the materials that are needed" (EDA Guidelines at 3), and grantees and prime contractors should expect to provide technical assistance to MBEs with less experience, to help them obtain bonding, include them in an overall bond or waive bonding where feasible, and to assist them in obtaining working capital. The SBA will provide 90% guarantee for the bond and will provide working capital assistance, so lack of working capital will ordinarily not disqualify a minority business. (EDA Guidelines at 3–4). Finally, the Guidelines express the EDA's policy that it

"ascribes a high priority to the development and support of minority business enterprises and will enforce the 10% MBE participation strictly." (EDA Guidelines at 1).

## II. FACTUAL BACKGROUND.

Pursuant to this scheme, the Pennsylvania Department of Transportation (Penndot) has obtained initial approval for seven local public works grants, totaling over $11,745,000, and the City of Pittsburgh has obtained approval for fifteen grants, totaling almost $9,000,000. At the time of hearing[3] on September 30, 1977, Penndot had

---

3. On September 8, 1977, Plaintiff filed the instant action against the implementation of the MBE goals. On September 12, 1977, this Court, after notice and hearing, denied the

Plaintiff's request for temporary restraining order and hearing on the request for preliminary injunction was scheduled for September 30, 1977. On September 28, 1977, the Commerce

already opened bids on three of the projects (in Mercer, Wyoming and Erie Counties) and had scheduled others to open on October 6th and 27th and sometime in November. The City had advertised bidding on some projects, was about to do so on others, and the bids were scheduled to open at various dates throughout October, beginning October 6th.

On the three projects already let out for bidding by Penndot, four bids were submitted on the Mercer County project, five on the Wyoming County project, and three on the Erie County project. All bids met the 10% MBE requirement and each bidder certified that its minority business participation was bona fide. Six of these bidders were Association Members who identified minority businesses in their bids, and no bidder has requested the Commonwealth to seek a waiver of the 10% provision. Nor has the City received such a request.[4]

The Association Members, primarily involved in heavy and highway construction, do a substantial portion of Penndot's and the City's heavy and highway business in the 33 county area which they represent. (See Footnote 1). In performing heavy and highway construction, a prime contractor typically subcontracts about 13.7% of the work (the percentage will be higher if a major part of the project involves bridge construction, but on some types of contracts the contractor may not subcontract any of the work), and about 30% of the bid involves the purchase of materials for the job.

All four prime bidders on Penndot's Mercer County project (a concrete bridge construction) were Association Members. Brayman Construction, also an Association Member, was a subcontractor responsible

for $166,000 of the over $400,000 of the apparent low bid of Bracken Construction. Because only $156,000 of the project was funded by LPW funds, the minority set-aside was $15,600. Bracken, the prime contractor, had negotiated with Brayman for the subcontract bid and asked Brayman to take care of the 10% set-aside. Brayman then contracted with R. L. Johnson Corporation, a minority business, for $16,000 to place reinforced steel on the bridge, work which Brayman would otherwise have done itself.

The apparent low bidder in Erie County was a non-Association Member who submitted a bid about $29,600 below the second place Association Member. No contracts have yet been finally approved by the EDA and officially awarded to the low bidders.

## III. THE EXHAUSTION OF ADMINISTRATIVE REMEDIES.

The Secretary of Commerce, the Commonwealth and the City urge that this action is barred because neither the Plaintiff nor its members have exhausted their administrative remedies. At first glance this argument has considerable cogency for the Court is well aware that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corporation*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638, 644 (1938). And in the Administrative Procedure Act (5 U.S.C. § 704), Congress mandates that, except as otherwise provided by statute, only "final agency action" is subject to judicial review.

However, an examination of the Complaint and proofs in this case show that it is

Department moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on the basis that the Plaintiff had failed to exhaust the administrative remedies available to it, in that it had failed to request the Defendant Grantees to seek waivers on its member's behalf, and that the Plaintiff lacked standing to bring this action.

4. On March 11, 1977, representatives of the Plaintiff attended a pre-bid meeting called by

the City to acquaint potential contractors with the Round II bidding requirements. Subsequent thereto, none of the Association Members contacted available referral services such as OMBE or SBA, nor requested the City to seek waivers on their behalf. Nor did the City seek waivers. The Commonwealth has stated in its grant application that waivers may be necessary for certain projects.

not the operation of the Administrative Regulations and Guidelines that is being challenged, except insofar as they flow from an allegedly unconstitutional statutory classification on the basis of race and national origin. The Regulations do factually frame the basic constitutional problem, but the Plaintiff does not base its case on the arbitrariness of the Administrative Guidelines. Rather, the Association contends the MBE requirement of PWE is unconstitutional since *it* imposes quotas and invidiously classifies on the basis of race and national origin.

The exhaustion principle is carefully defined by the Supreme Court in *Public Utilities Commission of California v. United States*, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958). There, the California statute required prior approval by the State Public Utilities Commission for the continuation of a longstanding practice, sanctioned under federal law, of negotiating with common carriers for special rates for the shipment of government property within the United States. When the United States sued for a declaration that this law was unconstitutional, the State countered that the Government had failed to exhaust its administrative remedies. The Court held that the constitutionality problem was one that the administrative agency could not be expected to entertain, saying:

> "If . . . an administrative proceeding might leave no remnant of the constitutional question, the administrative remedy plainly should · be pursued. But where the only question is whether it is constitutional to fasten the administrative procedures onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective

way of protecting the asserted constitutional right." (355 U.S. at 539–40, 78 S.Ct. at 450).

Counsel for the Plaintiff correctly point out that significant limitations on the exhaustion doctrine have recently been recognized. See *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). In this case, the success or non-success of obtaining an administrative waiver is inconclusive of the constitutional question. There are no factual determinations which the EDA could make concerning the availability of a waiver which would clarify or eliminate the need to resolve the constitutional issue, or which would remedy the alleged basic constitutional flaw in the Act. The PWE compels contractors, grantees, and the Secretary to racially and ethnically classify business enterprises for the distribution of funds and granting of waivers. As in *Public Utilities Commission, supra,* the Plaintiff here challenges this statutory directive which requires them to seek administrative relief, if available, from an alleged unconstitutional burden. The EDA cannot be expected to rule the Act under which it is functioning is unconstitutional, nor would it have the power to do so if it were so inclined. Nor can the Administrator grant a waiver for any reason other than the unavailability of qualified MBEs. It is clear that Congress inserted the MBE provision, not to give the EDA discretion to fashion its own scheme for distributing the grants, but only to provide for EDA discretion to exempt those areas where insufficient MBEs operate to meet the 10% goal.[5] There is no adminis-

---

5. One could, for example, pose the possibility that exhaustion of the administrative process here would leave no remnant of the constitutional question because the Secretary might conclude that its waiver requirement is unconstitutional, rescind its own regulations and guidelines, and allow exception from the 10% provision upon request. Or, under its authority and discretion, it could decide not to issue grants where non-minority businesses would be adversely affected. In either case, the Secretary's action would fly in the face of its own regulations and clear statutory intent. The phrase in the statute "except to the extent the Secretary determines otherwise" was intended to permit the Secretary to provide waivers for areas where no minority businesses were available. See Cong.Rec.H. *supra,* at 438–39. To ignore the 10% requirement for other reasons would be counter to the statutory directive.

trative remedy intended for the non-minority contractor who has been, or will be, deprived of his contractual rights where MBEs are available. As the EDA is without power to decide the constitutional issue or to eliminate its factual basis,[6] this Court's exercise of jurisdiction would present no threat to administrative autonomy, nor would it interfere with any fact-finding process which would abrogate the need to resolve the constitutional issue before the Court.

Furthermore, the Court has serious doubt that the exhaustion doctrine could bar the Plaintiff here in any event. The EDA Guidelines, page 14, specifically provide, in accordance with the Secretary's Regulations, that "[o]nly a Grantee can request a waiver" from the EDA. If either the Commonwealth or the City decide not to seek a waiver, and none have been sought to date, the Association has no available administrative remedy which it would be required to exhaust. Nor does any administrative procedure exist which requires contractors to request the Commonwealth or the City to seek a waiver. The Association's only recourse, then, is in the Courts.

## IV. THE STANDING ISSUE.

■ The Defendants contend the Plaintiff lacks standing to raise the constitutional issue in the absence of allegation and proof that Plaintiff's members have bid on PWE funded contracts, have sought waivers on any such contracts, have unreasonably been denied waivers, or have had responsive bids rejected because of the application of the MBE provisions. The Plaintiff, to the contrary, alleges that bids are presently being accepted and contracts are about to be awarded which put the Association Members in present jeopardy. The proof is that prime contractors are looking for MBEs to take the 10% which must be

given them, and under the time schedules the future business of the Association Members is already in danger.

In *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Court stated the law with respect to associational standing as follows:

"The association must allege that its members, or any of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case if the members themselves brought suit. . . . So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensible to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." (422 U.S. at 511, 95 S.Ct. at 2211–2212, Citation omitted).

It would appear to the Court that the Association Members are suffering "distinct and palpable" competitive injury which is recognized as sufficient in and of itself to invoke the Court's power. *See Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *National Motor Freight Assn. v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). To meet this 10% set-aside, Brayman Construction, an Association Member and successful bidder on the Mercer County Penndot project, has already contracted out work it normally would have performed itself. Other member general contractors, in the bids already submitted and in preparation for those about to be let, are forced to seek out subcontractors and materials suppliers on the basis of the statutory minority classifications and to add race as at least one, if not the primary

---

Therefore, the waiver process is an integral part of the statutory purpose and Plaintiff's members are injured by having to utilize it. No reasonable possibility exists, then, which would eliminate by agency action the need to resolve the constitutional question.

6. See text, *infra* at 945–946, for disruption caused in pre-bid and bidding stages before a waiver may be sought and whether or not a waiver is eventually granted.

factor in the complexity of considerations involved in that business judgment, thus disrupting the balance of other factors contractors normally weigh. It also operates to the detriment of non-minority subcontractors and suppliers seeking business with prime contractors. Whether race was *the* factor in their losing the business with the general contractor is not a necessary determination to find injury if the racial classification was an unconstitutional limitation on their ability to compete for the business. In the bidding that has occurred, all bidders met the 10% provision, so under the Secretary's regulations and guidelines, no waiver may be granted, and these injuries are not reversible without court action.

Finally, the award of three Penndot contracts is imminent and since the minority business requirements were met by the bidders, a waiver cannot be granted under the Regulations. Approval is therefore more than a hypothetical possibility, rather it is a virtual reality, and the grants will have been awarded in a race-conscious manner to the detriment of non-minority businesses which are harmed in their ability to compete for the contracts. These injuries are more concrete and direct than the tenuous harm claimed by the Homeowners Association in *Warth v. Seldin, supra,* where the plaintiff could show no direct connection between the challenged zoning provision and the inability to find housing. The effects of this provision on the Association Members here are real and sufficient to assure a concrete controversy and aggressive presentation of the constitutional question, and the Association therefore has standing to sue to protect the interests of its Members.

## V. LACHES.

■ The City also contends that the Plaintiff is guilty of laches for delaying the bringing of suit after knowing of the alleged deprivations of its rights. The short answer to this contention is that while there are no certain periods within which a plaintiff may reasonably delay before filing suit (*Clark v. Volpe,* 342 F.Supp. 1324, *aff'd*

*per curiam* 461 F.2d 1226 (5th Cir. 1972); *Fruit Industries v. Bisceglia Bros. Corp.,* 101 F.2d 752, 754 (3rd Cir. 1939)), the Court cannot conceive that it can be argued seriously that the delay of one month, from August 11, 1977, could be construed, under the circumstances of this case, to be unreasonable.

In light of the above dispositions, we now must proceed to the constitutional argument of the Plaintiff, strenuously resisted both by the Secretary of Commerce and the Commonwealth, and on which the City is taking no position.

## VI. THE CONSTITUTIONAL ISSUE.

### A. *The Applicable Standard*

■ The Association claims that the PWE 10% MBE requirement creates an absolute racial and ethnic quota which invidiously discriminates against its members in violation of their Fifth Amendment rights. While the Fifth Amendment contains no equal protection clause, the precepts of equal protection have been read therein as co-extensive with those under the Fourteenth Amendment. *Washington v. Davis,* note 2, *supra* ; *Johnson v. Robison, supra* ; *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Schneider v. Rusk,* 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964). Under either Amendment, racial classifications are constitutionally "suspect", and, as the Supreme Court stated in *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010, 1017 (1967),

"[a]t the very least, the Equal Protection Clause demands that racial classifications . . . be subjected to the 'most rigid scrutiny' . . . and, if they are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial determination which was the

object of the Fourteenth Amendment to eliminate."

This "strict scrutiny" standard [7] requires (1) that the governmental objective must serve "a compelling state interest", *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), and (2) that the means of accomplishing the objective be necessary and the least discriminatory means available. *Loving v. Virginia, supra ; Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The question arises, then, as to whether this "strict scrutiny" is also mandated when race is used for remedial purposes.

The Defendant Secretary of Commerce and the Commonwealth point out that race has been used in a variety of remedial contexts. Congress has a special responsibility for interpreting and enforcing the Civil Rights Amendments to the Constitution, *see South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), and has in the past authorized expenditures for such measures, the most recent of which is the Public Works Employment Act here under consideration. They also enumerate the many minority-sensitive programs of the federal government, *e.g.,* plans under Executive Order 11246 (30 Fed.Reg. 12319, as amended 32 Fed.Reg. 14303) require federal contractors to take affirmative action to prevent disproportionately low employment of women and minorities in their work force, the constitutionality of which have been repeatedly upheld. *Contractors Ass'n of Eastern Pa. v.*

*Secretary of Labor,* 442 F.2d 159 (3rd Cir.), *cert. denied* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Rossetti Contracting Co. v. Brennan,* 508 F.2d 1039 (7th Cir. 1974); *Northeast Construction Co. v. Romney,* 157 U.S.App.D.C. 381, 485 F.2d 752 (1973); *See The Philadelphia Plan : A Study in the Dynamics of Executive Power,* 39 U. of Chicago Law Rev. 732 (1972). In particular, they refer to the series of federal programs designed to aid minority businesses. See note 8 *infra.* Additionally, race may be considered in devising remedies for private discrimination, *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); in reapportionment of voting districts, to protect rights of certain minority groups, *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); in the implementation of the Civil Rights Act of 1964, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); and in school desegregation, *North Carolina Bd. of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971). In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), racial criteria were permitted to counteract a test which appeared to screen out black applicants for employment at a disproportionately high rate. (*See Germann v. Kipp,* 429 F.Supp. 1323 (W.D.Mo.1977); and *Associated General Contractors v. San Francisco,* 431 F.Supp. 854 (N.D.Cal.1977) for general discussion of these cases.)

In *Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra,* the Philadelphia Plan required bidders on any federal or

---

**7.** Strict scrutiny may also be mandated when a fundamental right is violated. However, Plaintiff has no fundamental constitutional right here. In *Germann v. Kipp,* 429 F.Supp. 1323, 1333–4 (W.D.Mo.1977), a case involving discrimination in public employment, the Court concluded:

"We begin with the basic that no person possesses a constitutional right to public employment. *NAACP v. Allen, supra,* 493 F.2d 614 at 618; *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n.,* 482 F.2d

1333, 1337 (2d Cir. 1973); *see San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 29–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ('It is not the province of this court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws.' *Id.* at 33, 93 S.Ct. at 1297). Thus, operation of the City's affirmative action plan denies no one any specific right conferred by the Constitution."

Likewise, here there is no such fundamental right to public works funds.

federally assisted construction contracts for projects in a five county area around Philadelphia to submit acceptable affirmative action programs which included specific goals within a specified range for utilization of manpower in certain skilled crafts. Circuit Judge Gibbons, speaking for the court, made the following succinct statement (442 F.2d 159, at 176–7):

"Finally, the plaintiffs urge that the specific goals specified by the Plan are racial quotas as prohibited by the equal protection aspect of the Fifth Amendment. *See Shapiro v. Thompson,* 394 U.S. 618, 641–42, 89 S.Ct. 1322, 22 L.Ed. 600 (1960); *Schneider v. Rusk,* 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Philadelphia Plan is valid Executive action designed to remedy the perceived evil that minority tradesmen have not been included in the labor pool available for the performance of construction projects in which the federal government has a cost and performance interest. The Fifth Amendment does not prohibit such action."

And in *Associated General Contractors of Mass., Inc. v. Altshuler,* 490 F.2d 9 (1st Cir. 1973), *cert. denied* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974), the court was required to construe certain contract requirements imposed by the Commonwealth of Massachusetts upon contractors engaged in publicly funded construction work. There was a requirement that the contractor "maintain on his project, which is located in an area in which there are high concentrations of minority group persons, a not less than twenty percent ratio of minority employee man hours to total employee man hours in each job category". The contract also required the contractor to engage in special referral procedures, to cooperate with the liaison committee composed of various representatives from community groups, to make weekly compliance reports to the liaison committee and to the Massachusetts Commission Against Discrimination, and to permit the Committee access to the books, records and accounts containing employment information. Chief Judge Coffin made the following statement (490 F.2d at 16–17):

"The first Justice Harlan's much quoted observation that 'the Constitution (is colorblind) . . . (and) does not . . permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights', *Plessy v. Ferguson,* 163 U.S. 537, 554, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896) (dissenting opinion) has come to represent a long-term goal. It is by now well understood, however, that our society cannot be completely colorblind in the short term if we are to have a colorblind society in the long term. After centuries of viewing through colored lenses, eyes do not quickly adjust when the lenses are removed. Discrimination has a way of perpetuating itself, albeit unintentionally, because the resulting inequalities make new opportunities less accessible. Preferential treatment is one partial prescription to remedy our society's most intransigent and deeply rooted inequalities.

Intentional, official recognition of race has been found necessary to achieve fair and equal opportunity in the selection of grand juries, *Brooks v. Beto,* 336 F.2d 1 (5th Cir. 1966); tenants for public housing, *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir. 1973); *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920 (2d Cir. 1968); *Gautreaux v. Chicago Housing Authority,* 304 F.Supp. 736 (N.D.Ill.1969); school administrators, *Porcelli v. Titus,* 431 F.2d 1254 (3d Cir. 1970); and children who are to attend a specific public school, *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

The intentional, official recognition of race in the selection of union members or construction workers has been constitutionally tested and upheld in two contexts. The first is where courts have ordered, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g), remedial action for past discrimina-

tion. In fulfilling their 'duty to render a decree which will so far as possible eliminate the discriminatory effects of the past . . . ', *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965), courts have ordered unions to grant immediate membership to a number of minority applicants, *United States v. Wood, Wire, and Metal Lathers International Union, Local No. 46,* 471 F.2d 408 (2d Cir. 1973), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); to begin an affirmative minority recruitment program, *United States v. Sheet Metal Workers International Ass'n, Local No. 36,* 416 F.2d 123 (8th Cir. 1969); to match normal referrals with minority referrals until a specific objective has been obtained, *Heat and Frost Workers, Local 53 v. Vogler,* 407 F.2d 1047 (5th Cir. 1969); or to take on a certain number of minority apprentices for each class of workers, *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir. 1971), *cert. denied* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). Courts have also ordered employers to hire minority employees up to thirty per cent of the total work force, *Stamps v. Detroit Edison,* 365 F.Supp. 87 (E.D.Mich.1973); to hire one minority worker every time two white workers were hired, up to a certain number, *Carter v. Gallegher,* 452 F.2d 315 (8th Cir. 1971), *cert. denied* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1st Cir. 1972); and in our own *Castro v. Beecher,* 459 F.2d 725 (1972), we order that black and Spanish-speaking applicants for police positions, who had failed to measure up to a constitutionally impermissible set of hiring standards, be given priority in future hiring.

The second context in which race has been recognized as a permissible criterion for employment is where courts have upheld federal affirmative action programs against challenges under the Equal Protection clause or under the anti-preference provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(j). Recognizing that the discretionary power of public authorities to remedy past discrimination is even broader than that of the judicial branch, *see Swann v. Charlotte-Mecklenburg, supra* at 16 of 402 U.S., 91 S.Ct. 1267; *cf. Katzenbach v. Morgan,* 384 U.S. 641, 653, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), courts have upheld the specific percentage goals and time tables for minority hiring found in the Philadelphia Plan, *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor,* 311 F.Supp. 1003 (E.D.Pa.1970), *aff'd,* 442 F.2d 159 (3d Cir. 1971), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), the Cleveland Plan, *Weiner v. Cuyahoga Community College District,* 19 Ohio St.2d 35, 249 N.E.2d 907, 908 (1969), *cert. denied,* 396 U.S. 1004 [90 S.Ct. 554, 24 L.Ed.2d 495] (1970), the Newark Plan, *Joyce v. McCrane,* 320 F.Supp. 1284 (D.N.J.1970), and the Illinois Ogilvie Plan, *Southern Illinois Builders Ass'n v. Ogilvie,* 327 F.Supp. 1154 (S.D.Ill.1971), *aff'd,* 471 F.2d 680 (7th Cir. 1972)."

The frequent use of race for remedial purposes, however, does not reduce the need for close scrutinization of its use. Nor do the above cited cases stand for the principle that "benign" racial discrimination is always constitutionally permissible. Although a consistent standard is difficult to discern from existing caselaw, in each case a judicial, executive or congressional finding of past discrimination preceded the race-conscious remedy. In *Associated General Contractors of Massachusetts, supra,* Judge Coffin concluded that racial classification could be constitutionally condoned "only where a compelling need for remedial action can be shown", 490 F.2d at 17, and "the means chosen to implement the compelling interest should be reasonably related to the desired end." *Id.* at 18. Finding both that the need to remedy the serious racial imbalance in the construction trades and that the means under consideration were reasonably related to that end, Judge Coffin further concluded that a program which included unrealistic minority hiring goals might impose an unreasonable burden on the employer and upon qualified workers

who were denied jobs because they were not members of the racial minority, and therefore a fair procedure for contractors must include "the necessary elements of procedural due process" for "[s]o long as contractors receive notice and a meaningful opportunity to challenge any allegations of non-compliance and prove that they have taken whatever efforts are required of them to comply, it is less important that a particular percentage goal might be slightly optimistic or unrealistic, given current availability of qualified minority workers." *Id.* at 19.

■ The Court is well aware that extreme caution is necessary when race is used for purportedly benign purposes, for, as Justice Brennan stated in *United Jewish Organizations, supra,* 430 U.S. at 174, 97 S.Ct. at 1014, 51 L.Ed.2d at 251, "the considerations that historically led us (the Court) to treat race as a constitutionally 'suspect' method of classifying individuals are not entirely vitiated in a preferential context." The dangers of determining rights and distributing benefits by racial categorization are, in fact, substantial. *See Associated General Contractors of Massachusetts, supra* at 17–18. A purportedly benign classification could conceal an invidious purpose. Or, the classification may actually be detrimental to the interests of the "preferred" minority, *United Jewish Organizations, supra,* 430 U.S. at 171–75, 97 S.Ct. at 1013–14, 51 L.Ed.2d at 250–52 (Brennan, J. concurring), if not when implemented, at some point in the future. Stigmatization of the preferred minority group could frustrate the achievement of minority individuals by perpetuating misconceptions about race, intelligence, and ability. Some also argue that reducing competitive standards to compensate inabilities to compete caused by past discrimination will actually discourage minorities from improving and eventually being able to compete on an equal basis. Finally, benign discrimination may, as claimed here, have adverse consequences on non-minority individuals and therefore be perceived as unfair. *Id.*

So the dangers of race discrimination are significant, even if for purportedly remedial purposes. But they do not, and they have not, compelled the conclusion that such classifications for remedial purposes are unconstitutional. What they do compel, however, is that the decisionmaker carefully scrutinize both the purpose of the statute and the means used. *Associated General Contractors of Massachusetts v. Altschuler, supra* at 17.

■ Thus, racial categorization remains suspect even in a benign cloak, and more than a rational basis is needed constitutionally to justify the legislation. *Associated General Contractors of Massachusetts, supra* at 17. *See Oburn v. Shapp,* 521 F.3d 142, 149–50 (3rd Cir. 1975). *But see Germann v. Kipp, supra,* 1335–8. To withstand constitutional scrutiny, the governmental purpose must be compelling. In addition, we conclude that the dangers of any racial classification require that the means used be necessary. *See Oburn v. Shapp, supra* at 149–50 & n.20. To be necessary, the means to be implemented must have a logical nexus to the compelling objective and must sufficiently reduce the dangers of such classification so that no less onerous alternatives are reasonably available. Finally, the statute must afford procedural due process by giving notice and reasonable opportunity to comply.

### B. *Application of the Constitutional Standard*

1. Compelling governmental interest.

■ If the legislative classification is intended to remedy the adverse effects of present or past discrimination, and not as an invidious discrimination against any racial or ethnic group, and the need for such remedial relief can be shown to be compelling, then the statute is serving a compelling state interest. *Associated General Contractors of Massachusetts, supra* at 17. This Court has no doubt that this 10% MBE provision was intended to attack a serious economic problem and not as a discrimination against any race. Although the focus

of the PWE is to channel funds quickly into local construction markets to reduce unemployment and improve local facilities, the 10% MBE provision was intended to serve an additional purpose: to remedy a deficiency in the 1976 Act which did nothing to enable minority business enterprises, competitively disadvantaged by past and present discrimination, to compete successfully for grant funds. Representative Mitchell introduced the amendment, identifying the compelling need for such remedial action since minority business enterprises were receiving only 1% of government contracts (123 Cong.Rec.H., *supra* at 1436–37.) The amendment is closely related to an overall federal scheme to assist minority business enterprises which have traditionally been excluded from industry.[8] Agency and census reports support this conclusion that remedial relief is a compelling need. Despite a minority population of about 17% minority individuals control only about 4% of the businesses in the United States, and minority businesses account for less than 1% of national gross business receipts and total business assets. (Interagency Report on the Federal Business Development Programs, March 1974, at 24; Minority Business Opportunity Committee Handbook, August 1976, at I–1). And it has been estimated that minority businesses obtain less than 1% of government contracts. (Minorities and Women as Government Contractors, U. S. Commission on Civil Rights Report, May 1975, at 2, 86 and 89).

The Minority Business Opportunity Committee Handbook, *supra*, after identifying the need for assistance in obtaining access to business opportunities, capital, profitable markets, loans and equity funding, and education and training, states at I–1–2:

"The severe shortage of potential minority entrepreneurs with general business management skills is a result of their historic exclusion from the mainstream economy. . . .

A related problem is the presence of commonly held assumptions and beliefs within the entire community concerning the business capabilities of minority people."

Likewise, the House Committee on Small Business reported on the minority business problem:

"The very basic problem . . . is that, over the years, there has developed

---

**8.** This federal scheme includes the following:

In March 1969, President Nixon issued Executive Order 11458, which sets forth a national policy of fostering minority business ownership and development. This Order led to establishment of the OMBE in the Department of Commerce to provide business assistance services to prospective or existing minority entrepreneurs. OMBE operates through a network of approximately 270 minority business development organizations which in fiscal 1975 served over 33,000 clients. OMBE's annual budget is in excess of $50 million.

In October 1971, Executive Order 11454 was superseded by Executive Order 11625, which requires all federal agencies to increase their efforts toward promoting minority business enterprise. 36 F.Reg. 199.

The SBA administers a variety of assistance programs aimed primarily at economically disadvantaged and minority entrepreneurs. Such programs include the Economic Opportunity Loan Program, which in fiscal 1974 made over 6,000 loans totaling more than $100 million; and the Minority Enterprise Small Business Investment Company Program (MESBIC), through which minority firms are provided venture and long-term capital, guaranteed loans, and management and technical assistance.

SBA estimates that more than 1,500 minority businesses have received assistance through the MESBIC program.

One of the most well-known SBA activities in this area is the so-called 8(a) program (15 U.S.C. § 637), through which the agency assists minority and disadvantaged persons in obtaining non-competitive federal contracts. Through fiscal 1975, over $1 billion in sub-contracts were awarded to target firms under this program.

Pursuant to 41 C.F.R. 1–1.1310, every federal agency is charged with establishing a minority procurement program to provide assistance to minority firms. All procurements in excess of $5,000 are required to include a statement requiring the contractor to use his "best efforts" to provide sub-contracting opportunities to MBEs. On procurements in excess of $500,-000, prime contractors are required to develop an affirmative action plan to insure fair consideration of MBE subcontractors.

In 1972 OMBE established the National Purchasing Council to increase procurements by private businesses from minority firms. The Council has set a goal of generating $1 billion in private sector sales for fiscal 1977. (Brief of the Secretary, at 29–30).

a business system which has traditionally excluded measurable minority participation. In the past more than the present, this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities. Minorities, until recently have not participated to any measurable extent, in our total business system generally, or in the construction industry, in particular. However, inroads are now being made and minority contractors are attempting to 'break-into' a mode of doing things, a system, with which they are empirically unfamiliar and which is historically unfamiliar with them." (Summary of Activities of the Committee on Small Business, House of Representatives, 94th Congress, at 182–83 (November 1976).

Thus, Congress has recognized that this inability of minority businesses is a direct result of past, and to a lesser extent, present discrimination.

■ While the lack of legislative history to support the purpose of the statute is troublesome, the Court cannot say that the statute is so crude that we cannot discern its remedial purpose. *See United Jewish Organizations, supra,* 430 U.S. at 173, 97 S.Ct. at 1014, 51 L.Ed.2d at 251 (Brennan, J., concurring). The minorities listed in the MBE definition are among those historically discriminated against in our society and were among those considered as minorities for purposes of the government reports on minority businesses.[9] The Court concludes that the 10% minority business provision was enacted pursuant to a compelling governmental interest of remedying the past and present effects of discrimination endured by minority business enterprises.

2. Necessary in terms of the least discriminatory means.

■ A troublesome question is whether the means here used to accomplish the remedial objective is warranted. Plaintiff argues that the PWE creates an absolute racial "quota" which is constitutionally impermissible. The Secretary of Commerce and the Commonwealth define the 10% requirement as a "goal" which may be waived if unobtainable. The characterization of the provision as a "quota" or a "goal", however, is not helpful to a determination of the constitutional question. Quotas, as well as goals, have been utilized in various contexts and have been judicially condoned. *See Oburn v. Shapp, supra,* and cases cited therein at n.20; *Associated General Contractors of Massachusetts, supra,* and cases cited therein; *Contractors Association of Eastern Pennsylvania, supra; Carter v. Gallagher,* 452 F.2d 315 (8th Cir.), *modified on rehearing,* 452 F.2d 327 (1971), *cert. denied* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Erie Human Relations Commission v. Tullio,* 360 F.Supp. 628 (W.D.Pa. 1973), *aff'd* 493 F.2d 371 (3rd Cir. 1974). The question for constitutional scrutiny is whether the means used by the legislature in this statute for MBEs is a necessary one under the circumstances.

The Amendment was introduced because existing programs which had utilized alternative approaches had not succeeded in raising minority business participation in government contracts above 1%. 123 Cong. Rec.H., *supra.* These programs to provide minority businesses with capital and technical assistance have therefore not entirely eliminated the competitive barriers for minority firms, and the "inroads" referred to

---

9. The Office of Minority Business Enterprises defines "minority business enterprise" as:

" 'Minority business enterprise' means a business enterprise that is owned or controlled by one or more socially or economically disadvantaged persons. Such disadvantage may arise from cultural, racial, chronic economic circumstances or background or other similar cause. Such persons include, but are not limited to, Negroes, Puerto Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts." (Executive Order No. 11625, October 13, 1971, 36 Fed. Reg. 19967.).

by the House Committee on Small Business are not enough. Indeed, the 1% minority business participation in government contracts estimated in 1976, see text *supra* at 951, is not substantially different from 1972 figures on gross construction industry receipts by minority firms (1972 Census of Construction Industries, Table A.1; 1972 Survey of Minority-Owned Business Enterprises, Table 5), suggesting that the ability of minority businesses to compete in the construction industry has not significantly increased. Moreover, capital and technical assistance programs do nothing to overcome barriers existing due to lack of confidence in minority business ability or racial prejudice and misconceptions.

Some other mechanism is therefore needed to guarantee participation by available and qualified minority businesses to give them a foothold in the competitive market. The 1% level which alternative programs have been unable to increase, at least in the short run, will not afford the opportunities to develop the experience, skills and reputation looked for in a competitive market. A percentage set-aside is the only effective way to crack the competitive barriers and end the cycle which continually excludes minority businesses from proportionate participation. This MBE provision will afford minority businesses this heretofore lacking opportunity to acquire experience, establish a reputation and rebut misconceptions about minority business capability.[10]

Given the need for some kind of set-aside to overcome the barriers built by racial discrimination, inclusion of a 10% set-aside in the PWE reduces many of the dangers inherent in even benign racial classifications and is a reasonable approach. Its inclusion in the Act, which is aimed at the construction industry, has a direct nexus to increasing participation by minority con-

tractors in government contracts and providing experience for competition in other markets. Also, the 10% figure is a reasonable one. Although the minority population is about 17%, the 10% figure is justifiably below that percentage, given their 1% past participation in the construction industry, and is not a concealed limitation on them. Since the program is short-term, there is no danger that the 10% requirement would become in practice a limitation of 10% once minority businesses have become established and competitive. On the other hand, the 10% requirement applies only to the extent local projects are funded by grants under PWE and is not overly intrusive on non-minorities. It is not a requirement that projects receiving federal funds assure that 10% of the *project* funds be given to minority businesses. Nor does it attempt to create an overall 10% requirement for the construction industry as a whole. These public works funds are intended to boost the construction industry by channeling extra funds into one aspect of the industry. A set-aside of 10% of these remedial funds for an additional remedial purpose is not unreasonable, especially given the availability of a waiver to the extent the 10% objective is unobtainable. See text *infra* at 953–954.

■ One very important restraint on the 10% provision in the PWE is the termination date of December 31, 1978 for appropriation of funds (selection of projects ended September 30, 1977). Thus, no affirmative decision is needed to terminate the set-aside, and there is no danger that the 10% figure will become an entrenched entitlement for minority businesses. To the contrary, if the Act is extended beyond the termination date, for a similar 10% provision to be constitutionally permissible there

---

**10.** Racial classification is the only workable way to create this set-aside. A more generalized classification such as "disadvantaged businesses" would be more difficult to apply efficiently and would not focus only on those businesses suffering because of past discrimination. Such overinclusiveness in the preferred class would be even more detrimental to the non-pre-

ferred majority than the present classification. While some minorities may argue they have been capriciously excluded from the preferred class, this is not the injury claimed by the Association, and the Court is not willing to say that Congress cannot focus on those groups it finds to be most grievously affected, even though others have also been affected.

must be *at that time* a demonstrably compelling need for remedial relief. This decision can be based on measurable statistics on minority participation and the success of other programs, and is not merely a subjective determination. In addition, because the 10% requirement is so short-term and covers only public works projects to the extent of the federal funding, minority businesses are encouraged to develop their own capital, expertise and reputation to survive in the competitive market.

The provision also has built in a waiver of the 10% requirement where no qualified minority businesses are available. Although the statute itself contains only the phrase "except to the extent the Secretary determines otherwise", the House debate reveals that this phrase was included specifically to assure that waivers be granted in areas where qualified minority businesses do not exist to perform the necessary work. 123 Cong.Rec.H., *supra* at 1437–41. PWE therefore does not create an impossible burden to obtain the funds. Grantees and contractors were also given reasonable notice of the requirement so that they could comply.

Finally, the dangers of adverse stigmatization of the minority businesses is not as significant in this context as in some others. The competitive preference carries no negative connotation as to innate intelligence or other innate qualities of minority individuals, but refers specifically to business skills, capital, experience and opportunity. As previously noted, it actually provides minority business operators the chance to rebut misconceptions about their ability once given the opportunity, proper training and technical assistance, and to establish a reputation upon which they can become effective competitors.

## VII. CONTRADICTORY STATUTES.

■ The Association further argues that the Act violates due process because it requires its Members to violate antidiscrimination provisions within the same statute and in other federal statutes. *See* 42 U.S.C. §§ 6727, 1981, 1983 and 1985. The 10% MBE provision and the antidiscrimination statutes have a common objective, to assure equality of opportunity and to remedy the lingering effects of discrimination. The Court is not convinced that using race as a factor in awarding subcontracts, when done without discriminatory intent and solely to comply with a legitimate federal remedial program and under the direction of State and local governments, creates such a statutory conflict.

Briefly restated, there is no inherent inconsistency between a requirement that contracting be done without discriminatory consideration of race and a requirement that every good faith effort be used to achieve minority participation pursuant to legislative mandate in grant funds. *See Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra.*

## VIII. SUMMARY.

The Court concludes that the 10% minority business enterprises provision as a Legislative mandate on public works funding does not violate the Constitutional rights of Association Members. We have applied a strict scrutiny standard and have found a compelling State interest that is served and that the provision is necessary to accomplish non-invidious ends.

■ The United States Constitution does not preclude affirmative action when a compelling need to which it is targeted contains no invidious discriminatory intent and the legislation contains sufficient restraints to reduce dangers inherent in even benign racial classifications. We do not here decide broad, sweeping principles of reverse discrimination, but hold only that in the area of a public works appropriation bill, limited of necessity in duration and scope, there is nothing constitutionally impermissible in requiring reasonable percentage minority business enterprise participation.

This Court takes no position on the wisdom of Congress' inclusion of the MBE provision in the Public Works Employment Act, for that is a legislative, not a judicial,

decision. The Court concludes here only that this legislation withstands the Constitutional attacks made on it, and the request for preliminary injunction will be denied.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law. An appropriate Order will be entered.