OHIO CONTRACTORS ASSN., Associated Contractors of Ohio, Inc., Pickney P. Brewer & Sons Co., Wm. A. Brewer and Daniel R. Dugan, Plaintiffs,

v.

The ECONOMIC DEVELOPMENT ADMINISTRATION, City of Cincinnati and Juanita Kreps, Defendants.

No. C–1–77–619.

United States District Court, S. D. Ohio, W. D.

Nov. 22, 1977.

Richard A. Frye, Columbus, Ohio, for plaintiffs.

Gerald F. Kaminski, Asst. U. S. Atty., Cincinnati, Ohio, for defendants.

Thomas A. Luebbers, Cincinnati, Ohio, for defendant City.

## MEMORANDUM: MOTION FOR PRELIMINARY INJUNCTION

HOGAN, District Judge.

This is an action for declaratory and injunctive relief brought by the named plaintiffs Ohio Contractors Association ("OCA"), Associated Contractors of Ohio, Inc., ("ACO"), Pickney P. Brewer & Sons Co., ("Brewer"), William A. Brewer and Daniel R. Dugan against the defendants Economic Development Administration ("EDA"), City of Cincinnati ("City") and Juanita Kreps, Secretary of Commerce ("Secretary"). The plaintiffs challenge the constitutionality of Section 103(f)(2) of the Public Works Employment Act of 1977 ("PWE Act"), Pub.L. No. 95–28, 91 Stat. 116–121, 42 U.S. § 6705(f)(2) and the regulations promulgated thereunder, which require that 10% of the amount of each federal grant authorized pursuant to the Act "be expended for minority business enterprises" ("MBE"). The plaintiffs also challenge the constitutionality of the 12% MBE requirement imposed by the "grantee" City for these same grants.

As a matter of preface, the Court notes that the constitutionality of § 103(f)(2) has been the subject of numerous actions recently initiated in other United States District Courts throughout the country.[1] None of these similarly-instituted actions have dealt with a local or grantee-imposed percentage requirement above the 10% figure in the federal legislation.

Few facts are in dispute in this action, and most are recited in considerable detail in the opinions by the Pennsylvania and California courts cited, *infra*. Nonetheless, a recitation of the legislative and factual background is necessary to facilitate an

---

1. *Construction Ass'n of Western Pennsylvania v. Kreps*, 441 F.Supp. 936 (W.D.Pa.1977); *Associated General Contractors of California v. Secretary of Commerce*, 441 F.Supp. 955 (C.D. Cal.1977); *Montana Contractors' Ass'n v. Sec-* *retary of Commerce*, 439 F.Supp. 1331 (D.Mont. November 7, 1977); *General Contractors of America v. Secretary of Commerce*, 77–8351–Civ–JE (S.D.Fla. November 3, 1977).

understanding of this Court's holding on a motion for a preliminary injunction.[2]

### LEGISLATIVE BACKGROUND

The Local Public Works Capital Development Act of 1976 (Pub.L. 94–369) ("LPW Act") became law on July 22, 1976. Congress appropriated $2 billion for implementation of the Act. Pub.L. 94–447. The program was to be administered by the Secretary of Commerce, through the Economic Development Administration (EDA), which distributes funds under the Act to state and local governments for public works projects. Grantees are required in turn to contract out project construction work to the private sector through competitive bidding. Sections 102–106; 42 U.S.C. §§ 6701–6705.

From October 26, 1976, through February 9, 1977, EDA received, processed, approved and denied thousands of applications from state and local governments for assistance under the Act. This period, generally referred to as "Round I" of the LPW Act, resulted in the final approval of approximately 2,000 projects.

Even before EDA had completed processing of projects under Round I, H.R. 11 and S. 427 were introduced in the U.S. House of Representatives on January 11, 1977, and in the U.S. Senate on January 25, 1977, respectively. The purpose of such legislation was, in effect, to provide additional funding under such Act. The Public Works Employment Act of 1977 became law on May 13, 1977. It amended the LPW Act and, in effect, authorized an additional $4 billion appropriation for a "Round II" program. The MBE provision was added by the PWE Act, and is only applicable to grants made under Round II of the program.

### I. ROUND I

The Report of the Committee on Public Works and Transportation of the U.S. House of Representatives accompanying the legislation that authorized Round I (Report No. 94–1077, 94th Cong., 2d Sess., at 2, U.S.Code Cong. & Admin.News 1976, pp. 1746, 1747) states that the LPW Act: ". . . has a twofold purpose: (1) to alleviate the problem of nation-wide unemployment, and (2) to stimulate the national economy by assisting State and local governments to build badly needed public facilities." Congress made explicit its intent to have the public facilities projects funded and commenced quickly:

> The bill is carefully and expressly designed to avoid the long lag time sometimes associated with public works programs. . . . To be eligible for a grant, a project must be started within 90 days of its approval if Federal funds are available. The bill also provides that applications must be acted upon by the administrative agency within 60 days of the date of its receipt. *Id.*, at 3, U.S.Code Cong. & Admin.News 1976, p. 1748.

Congress' determination to obtain speedy action by EDA is manifested by the following rather extraordinary provision of Section 107 relating to such 60-day period:

> Failure to make such final determination within such period shall be deemed to be an approval by the Secretary of the grant requested.

Section 107 required in addition that regulations to implement the Act be issued within 30 days of its enactment.

On December 23, 1976, EDA published a list of 1988 projects which had been provisionally selected for funding under Round I. 41 F.Reg. 56146. By February 9, 1977, final project processing had been completed, and a total of approximately 2000 projects were in fact approved. The approximately 23,-

---

**2.** This action was filed on October 31, 1977, and a motion for temporary restraining order was denied at that time. A hearing on the motion for a preliminary injunction was held on November 9, 1977, at which hearing the plaintiffs and defendants submitted testimony in the form of affidavits, as well as numerous exhibits. The Court at that hearing also took under consideration a motion to intervene as party defendants submitted by the United Minority Contractors of Cincinnati, Inc., and four minority contractors as defined by the PWE Act, § 103(f)(1)(B), (2).

500 rejected applicants had requested, in the aggregate, approximately $21.8 billion.

## II. ROUND II

The amendments effectuated by the PWE Act, in addition to extending the program, were designed to resolve certain problems encountered in administering Round I. See, Report of the Committee on Public Works and Transportation, U.S. House of Representatives, "Local Public Works Capital Development and Investment Act Amendments", H.R.Rep. No. 95–20, 95th Cong., 1st Sess., at 3 (1977) (hereafter "House Report"); Report of the Committee on Environment and Public Works, U.S. Senate, "Public Works Employment Act of 1977", Sen.Rep. No. 95–38, 95th Cong., 1st Sess., at 2–3 (1977) (hereafter "Senate Report"), U.S.Code Cong. & Admin.News 1977, p. 150.

However, the PWE Act retained the basic purposes and statutory scheme of the LPW Act.

For example, the House Report stated that hearings had revealed that changes were "in order to target Federal assistance more accurately into areas of greatest need" and that there was a:

. . . need for the public works jobs program and for increased federal funding. There was unanimous agreement that the program, properly directed, would be a significant factor in the attack on unemployment. Furthermore, they (the witnesses) noted the lasting contribution that would be made to the economic stability and well-being of communities all over America through their public works projects. (at 2, U.S.Code Cong. & Admin.News 1977, p. 151.)

The Senate Report stated the basic justification for continuation of the LPW Act program as follows:

Unemployment levels, particularly in the construction industry, remain at unacceptable levels. Economic recovery is still weak nationally, exacerbated further by the severe winter with layoffs and shortages of fuel. The lagging recovery limits the capability of local governments to carry out normal programs of capital expenditure for needed facilities. State and local government outlays for new construction for the 10-year period since 1967 have actually dropped in volume from $30.8 billion to 22 billion (using 1972 dollars). Continuation of the public works employment program will provide additional stimulus to the sluggish economy. (at 1–2)

Moreover, Congress again directed that funds under the Act be expended on an expedited basis. The PWE Act was enacted May 13, 1977. Yet EDA was, in effect, required to devise, establish and issue regulations and procedures, respond to inquiries, and to process and approve or deny thousands of applications by September 30, 1977.

Most significant in this regard are the terms of the Economic Stimulus Appropriations Act (Pub.L. 95–29, May 13, 1977, 91 Stat. 122), which appropriated $4 billion for Round II for the period ending September 30, 1977. Thus, EDA was required to meet a September 30, 1977, deadline for obligation of all Round II funds. This deadline has been met, and all funds under the Act have been obligated.

The rationale for such speedy commitment of Round II funds is as follows:

The impact of the severe winter on the economy and especially on unemployment levels provides additional reason for speedy commitment of these funds. The committee recommends haste in commitment of appropriated funds in order to achieve substantial project initiation this construction season. Senate Report, at 45.

To further insure speedy implementation of Round II, Congress added Section 108(h)(1) to the LPW Act, which provides:

(h)(1) Except as provided in paragraph (2) of this subsection, the Secretary shall not consider or approve or make a grant for any project for which any application was not submitted for a grant under this Act on or before December 23, 1976.

The Senate Report, at 3, explains that this amendment was designed to assure that

"grants can be awarded to take advantage of the 1977 construction season."

Congress' interest in extremely expeditious implementation of the Round II program is further manifested by the fact that it retained the requirements of Section 107 of the LPW Act that regulations must be issued within 30 days of enactment, and that an application must, in effect, either be approved or rejected by EDA within 60 days of receipt or the application is deemed approved as a matter of law. Finally, the requirement of Section 106(d) that grantees commence construction within 90 days of project approval remains an important part of the legislation.

Congress was also concerned that funds be expended consistent with national policy as expressed through other legislation and federal programs. See, e. g., §§ 106(e)–(g), 107, 109, 110; 42 U.S.C. §§ 6705, 6706, 6708, 6709. The MBE goal is among the special provisions drafted toward this end. Section 106(f)(2); 42 U.S.C. § 6705. This clause requires:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this Act for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprises" means a business at least 50 per centum of which is owned by minority group members or, in case of publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

The MBE goal amendment first arose during floor debate in the House February 24, 1977. 123 Cong.Rec.H. 1441. Congress' express purpose was to remedy the situation whereby "minority businesses have received only 1 percent of the Federal contract dollar despite repeated legislation, Executive Orders and regulations mandating affirmative efforts to include minority contractors in the Federal contracts pool." 123 Cong. Rec.S. 3910, March 10, 1977.

The Secretary has, in accordance with authority granted at Section 107, promulgated regulations under this provision (13 C.F.R. 317.19(b); 42 F.Reg. 27434–27435 [May 27, 1977]) which provide:

> (b) . . . (1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises. (2) The restriction contained in paragraph 1 of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured.

These statutory and regulatory provisions have been further interpreted through two sets of guidelines. On June 6, 1977, the Department issued *Guidelines For Round II of the Local Public Works Program* which read, in pertinent part (Section VIII, B. 1, pp. 30–31):

> 1. *Minority Business Enterprise.* No grant shall be made under this Act for any project unless the applicant gives satisfactory assurance that at least 10 percent of the amount of each grant will be expended for contracts with and/or supplies from minority business enterprises.
>
> a. EDA will require each applicant to provide assurance, as part of the resubmission process, that it will meet the 10 percent minority business enterprise requirement. Each applicant must insert a clause, within the terms and conditions of his bidding documents, that will require any successful bidder to expend 10 percent of the bid amount for minority business enterprise located within a reasonable trade area determined in relation to

the nature of the services or supplies intended to be procured.

b. The applicant/grantee will have the right to request a partial or total waiver of this requirement. This waiver request may be made either at the time of resubmission of the project or subsequent to project approval. The applicant must provide a statement of justification in support of its requests for waiver. This statement must consider the following:

—the size of the minority population in the project area;

—the availability of minority enterprise in the reasonable trade area from which contractors, subcontractors, and suppliers will be drawn for the project;

—the efforts the grantee and prime contractors have exerted to enlist minority firms; and

—any other relevant facts.

The Regional Director will make the final determination as to whether the waiver will be granted.

In August 1977, EDA issued 16-page *Guidelines for 10% Minority Business Participation in LPW Grants*, which set forth detailed instructions regarding implementation of the provision. The MBE *Guidelines* contemplate that, while grantees are primarily responsible for assuring compliance with the provision, they will work in cooperation with prime contractors in attempting to locate and involve minority enterprises in the various grant projects.

These guidelines require that "every Grantee should make sure that it knows the names, addresses and qualifications of all relevant MBE's, *i. e.*, minority business enterprises. . . ." MBE *Guidelines*, p. 4. The *Guidelines* go on to point out that the Office of Minority Business Enterprise (OMBE) in the U.S. Department of Commerce and the Small Business Administration (SBA) are prepared to assist grantees and prime contractors in fulfilling the MBE goal. MBE *Guidelines*, pp. 4–6, 16.

In the event there are insufficient qualified minority enterprises in the relevant market area, the grantee may apply to the EDA Regional Director for a waiver. MBE *Guidelines*, pp. 13–16. Waivers will be considered on a project-by-project basis. The *Guidelines* specify that:

Ordinarily a waiver will be considered only after the Grantee and its prime contractors have taken every feasible action to achieve at least 10% MBE participation. For example, if the Grantee or its prime contractors have taken all feasible steps to locate relevant MBE's and has requested all available qualified MBE's to participate as contractors, subcontractors or suppliers and not enough MBE's can or will participate to reach the 10% MBE participation goal, a waiver request detailing the efforts of the Grantee and its prime contractor may be necessary in order for the project to proceed.

MBE *Guidelines*, pp. 14–15. The waiver request must list "the efforts the Grantee and potential contractors have exerted to locate and enlist MBE's," and "the specific MBE's which were contacted and the reason each MBE was not used." Use of available referral sources such as OMBE and SBA will be considered. MBE *Guidelines*, pp. 14, 16.

The *Guidelines* contemplate that, in view of the showing which must be made, "a waiver request would ordinarily be made after the initial bidding or negotiation procedures proved unsuccessful." MBE *Guidelines*, p. 15. However, the *Guidelines* also provide that a Grantee in an area where the minority population is very small may apply for a waiver before requesting bids if the Grantee can show that there are no available, qualified minority business enterprises which could reasonably be expected to furnish services or supply materials for the project. MBE *Guidelines*, p. 15.

On October 11, 1977, EDA issued a Technical Bulletin for the purpose of providing additional information to Grantees and their contractors in meeting the ten percent MBE requirements. The Technical Bulletin sets forth, as does the MBE *Guidelines*, the requirements that the Grantee must satisfy in order to obtain a waiver.

## STATEMENT OF FACTS

EDA has approved $10,992,000 worth of Round II projects for the City of Cincinnati. All such funds were obligated by the September 30, 1977, statutory deadline.

Plaintiff Associations have members who have or seek to bid on projects which are included in the projects EDA has approved as part of Round II. Plaintiff Pickney P. Brewer & Sons Company is a member of the Ohio Contractors Association and has bid on some of the projects.

With regard to waiver requests, the EDA Chief of Civil Rights for the Midwestern Regional Office, Warren K. Plath, instructed all the civil rights specialists in the Midwestern Regional Office of EDA to tell officials of grantees and contractors that requests for waivers submitted with grant applications would not be considered at the time grant applications were received, but rather waiver requests would be considered after grantees exhausted all sources for finding MBE's and had documented such efforts to EDA.

There is some conflict in the parties' statement of facts concerning the waiver provisions of the regulations as applied to the grants and the bids solicited thereunder by the City. As a preliminary matter, the Court finds it apparent from the deposition of Norman Macon, City of Cincinnati Contract Compliance Officer regarding a document identified "U.S. Department of Commerce, Economic Development Corporation, Local Public Works Program, Round II, Guidelines for 10% Minority Business Participation in LPW Grants", (plaintiffs' Exhibit 2), that such document provides, at the very least, an affirmative encouragement to major cities to require more than 10% MBE participation in the funds disbursed under each grant in this program (Macon Dep. at

36, see letter of Robert T. Hall, plaintiffs' Exhibit 3). There is also evidence that Mr. Macon regarded the *Guidelines* and interpretative glosses given to him by EDA officials to require strict compliance with the minimum 10% figure (Macon Dep. at 15, 31; but see affidavit of Warren K. Plath, Defendant EDA Ex. G; affidavit of Richard Frantz, plaintiffs' Exhibit 17). It also appears that no waiver has been requested by the grantee City nor has the City been requested to seek a waiver by any contractor, affidavit of William V. Donaldson, defendant City Ex. J.; affidavit of Naomi Churchill, defendant EDA Ex. H.

The City's 12% MBE participation figure, as explained in the affidavit of Kevin Shepard, defendant City, Ex. F, was computed to assure that, after non-construction, non-subcontractable items such as administration, project inspection and contingency reserves were allocated from a grant, the MBE contracts still equal or exceed the 10% "floor" imposed by § 103 *Id.*; but see Macon deposition at p. 13.

## INJUNCTION: PROBABILITY OF SUCCESS ON THE MERITS

■ Of the four factors which the Court must consider in ruling upon a motion for preliminary injunction[3] the threshold issue is whether or not the party seeking an injunction is likely to succeed on the merits. It appears at the outset that this case does involve a "quota," and not a "goal" or "target" situation. The waiver provision of this Act and the regulations promulgated to implement it permit waiver only in the circumstances of practical impossibility. Under the Act when minority contractors or sub-contractors are available and submit reasonable bids[4] they must be awarded contracts equally at least 10% of the grant.

---

**3.** The four factors generally considered by most courts are 1) the threat of irreparable injury to the plaintiff; 2) the balance between the harm to the plaintiff and the injury to the defendant; 3) the probability of plaintiff's success on the merits and 4) the public interest; 11 Wright & Miller *Federal Practice & Procedure* § 2948 (1973); *see* especially *Mason Co. Medical Ass'n*

*v. Knebel,* 563 F.2d 256 at 261 n. 4 (6th Cir. 1977).

**4.** There are provisions in the waiver regulations to accommodate circumstances when minority contractors supply only exorbitant bids, EDA Minority Business Enterprise Technical Bulletin, October 11, 1977 (defendant EDA Ex. E) at pp. 9–10.

The issues, if squarely faced, are whether Congress may condition the receipt of federal public works grants upon the maintenance of a racial quota; if so, under what conditions; and finally, what limits, if any, are placed upon such quotas.

Under traditional standards long exercised in cases of invidious racial discrimination under the equal protection clause of both the Fourteenth and Fifth Amendments,[5] a strict scrutiny of the legislation is exercised by a reviewing court, *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). While all legislation is clothed in a presumption of constitutionality, in a situation in which a statute which upon its face imposes quotas based upon race or national origin is challenged, the burden of proof is upon those establishing the quota, *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The standard test employed in such a scrutiny inquires as to whether (1) the challenged legislation embodies a compelling state interest, and, if so, whether the means of accomplishing the objective are (2) necessary and (3) the least restrictive means available, *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *Loving v. Virginia, supra.*

[6] It would appear from past legislative activity in general and from the judicial testing of such legislation that the eradication of not only present racial discrimination but also the residual effects of past discrimination has long been a compelling state interest. Examples of remedial judicial, legislative and executive "affirmative action" indicated in this context are cited, *infra*.[6] It is sufficient to say that eradication of the effects of past discrimination is an important, high-priority interest. The initial concerns of the Court in the context of this action are (1) whether a reviewing court must scrutinize legislation which clearly fits within a recognized general area of compelling state interest to determine whether, for example, the federal government has a *specific* compelling interest in eradicating the effects of past discrimination on the opportunity of minority construction contractors, and (2) if so, what factors can be considered in such a determination. While not so naive as to state that the Congress has carte blanche to act once it can be shown that its general objective is the eradication of the past effects of racial discrimination, this Court cannot find any justification for scrutinizing every Congressional act containing "affirmative action" to determine whether it *particularly* serves a compelling state interest. Such a task is not only judicially—if not factually—impossible, but also would require a *de novo* inspection of each particular item of legislation in a general area of accepted compelling state interest. The interest of Congress in eradicating the effects of discrimination on minority construction contractors falls within the well-established general state interest in promoting racial equality of opportunity, and the Act is found to satisfy the requirement that a compelling state interest be involved.

The more difficult analysis in this case is whether the present legislation is

---

5. The Fifth Amendment contains no equal protection clause *per se*. The due process clause does, however, contain an equal protection element applicable to racial discrimination to the same extent as the equal protection provisions of the Fourteenth Amendment, *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

6. The opinion of Judge Snyder in *Construction Ass'n of Western Pennsylvania v. Kreps, supra,* 441 F.Supp. at 947 details some of the affirmative action cases in the Labor field; *see* Executive Order 11246 (30 F.Reg. 12319 as amended 32 F.Reg. 14303) the so-called "Philadelphia Plan"; *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159 (3rd Cir.) *cert. denied* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Rossetti Contracting Co. v. Brennan,* 508 F.2d 1039 (7th Cir. 1974); *Associated General Contractors of Mass., Inc. v. Altshuler,* 490 F.2d 9 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); *United Jewish Organization v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *North Carolina Bd. of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1975).

both necessary and the least restrictive means available. Speaking theoretically, the government's interest in eradicating the effects of past discrimination on minority contractors is one thing. Scrutinizing the remedy—the 10% MBE requirement—is quite another, and provokes a further question of how a court analyzes an Act of Congress in these circumstances. On the one hand, there must be some justification apparent from the face of the Act and/or its legislative history to support the necessity for legislation imposing racial quotas. On the other hand, this Court can discover few standards for deciding how much "justification" must appear on the record, or whether it must appear in the record at all. More particularly, to the extent that underlying facts or assumptions are stated or reasonably implied, to what extent are such statements of fact or assumptions open to attack? Does the Court strictly scrutinize the statement of the proponents of the 10% MBE quota that less than 1% of all government contractors grant funding goes to minority contractors? Does the Court strictly scrutinize the clear premise that minority contractors are not competitive because past discrimination in the building trades has limited minority access to the expertise necessary to be a successful construction contractor? To do so would require Congress to go beyond the mere exercise of its judgment to make the equivalent of judicial-type evidentiary findings. While an act of Congress which establishes invidious quotas must be supported by a showing of necessity, legislation premised upon statistical or judgmental assumptions which are not unreasonable may be found to be necessary to the implementation of a compelling state objective.

■ A court is not limited to the "record" compiled by Congress in its determination of the necessity of a particular piece of legislation to cure an evil of compelling importance. To the extent that the as-

sumptions underlying a Congressional finding of necessity are verified in separate but reliable reports and studies not in the "Congressional record" of the legislation, the Court may consider such data. Having considered the supporting exhibits proffered by the defendant EDA,[7] the Court finds the necessity for additional measures to combat the effects of prior discrimination upon minority contractors to be adequately supported.

■ At this point the Court notes a difficulty with the (lack of) "data" supporting an important assumption as to the reasonable and necessary character of this legislation. Notwithstanding the numerous cases cited by the defendant EDA showing employment discrimination to be a serious problem in the construction industry, there is no citation for the premise that such discrimination is a factor in denying minority business enterprises access to construction contracts. While this Court finds such a premise to be an entirely reasonable explanation for the low participation level of minority business, an assertion contained in the Congressional Record does not, to this Court's mind, amount to substantial evidence, if there is ever evidence to prove a negative proposition. The Court would, however, be loathe to interfere with the judgmental discretion of Congress, even in a case such as this. To the extent that a reasonable premise has been developed, a Court should not inquire further to weigh the supporting and contradicting evidence.

Turning to the "less-restrictive alternative" analysis, the Court finds such an evaluation, to a certain degree, fruitless.

On a purely arithmetic scale, 9% would be less restrictive than 10%, and so on. The real issue is whether there is a less restrictive alternative than a reasonable quota. The legislative history, if it indicates anything, shows that other, less-restrictive al-

7. *See, e. g.,* Interagency Report on Federal Minority Business Development Programs, March, 1976 at p. 24 (defendant EDA Ex. N); Minority Business Opportunity Committee Handbook, August, 1976 (defendant EDA Ex. N); Minorities and Women as Government Contractors (Civil Rights Commission, May, 1975) (defendant EDA Ex. K).

ternatives have not worked.[8] The quota is a reasonable alternative that is as non-restrictive as possible under the circumstances.[9]

## EQUITABLE FACTORS, PUBLIC INTEREST

Assuming for the moment that this Court could find a probability of plaintiffs' success on the merits, certain equitable factors would be relevant to the issuance of an injunction.

First, the Act requires the prompt letting of contracts and initiation of the projects. Under the conditions of the Act and the regulations, grant funds must be committed by the grantee by December, 1977 and construction started within ninety days of the contract. There is absolutely no affirmative showing that the funds would not be terminated if the 10% MBE quota is not met, and considerable evidence in the regulation that funding will be stopped if the quota is not satisfied or waived.

Secondly, of the eleven million dollars in grants which could be affected by any restraining order, bids for over seven million dollars of such contracts have already been or will shortly be opened, plaintiff Exhibit 1; affidavit of Richard J. Scharff, defendant City Ex. F.

Third, it appears beyond doubt that the public generally and Cincinnati and its residents particularly will be harmed by any injunction which would, in effect, arrest the implementation of the funds appropriated by the Act, affidavit of Anthony J. Sulvetta, defendant EDA Exhibit 2; affidavit of Arthur D. Bird, defendant City Ex F. The defendant City has no funds available to proceed with the enumerated EDA projects. Many of these projects involve essential services and facilities, including street repair and a hospital renovation. The residents of the City and the national economy in general will suffer the loss of the intended immediate input of grant funds to stimulate the economy and relieve unemployment generally. In particular, an estimated 2400 to 2600 person years of employment will be affected, including the equivalence of a full year of employment for 656 construction workers, defendant EDA Exhibit 2, affidavit of Anthony J. Sulvetta, at p. 3.

Fourth, at least some plaintiff non-minority subcontractors and non-minority general contractors bidding on grant projects will be irreparably harmed by a failure to grant the injunctions if, on the merits, the 10% MBE quota is found unconstitutional. General contractors unable to secure minority subcontractors are effectively precluded from bidding if one other contractor complies with the 10% requirement. Otherwise qualified non-minority subcontractors bidding directly against minority subcontractors and having lower bids are irreparably harmed by the likely loss of subcontract work.[10]

Balancing these equities, the Court must conclude that, even if it found a constitutional defect in the MBE quota, the loss of millions of dollars in grant projects and thousands of jobs would significantly outweigh the potential loss to some contractors. The damaging effect upon the City and the public is by far the more serious, and weighs heavily against an injunction.

## CONCLUSION

The motion for a preliminary injunction is denied. As to the federal 10% MBE

---

**8.** The comments by the Amendments proponent, Mr. Mitchell, cite the failure of the Office of Minority Business Enterprise and the Small Business Administration to significantly alter minority business participation in government contracting, 123 Cong.Rec. # H1436–1438 (February 24, 1977).

**9.** The Court is, of course, operating under the shadow of the pending decision in *Bakke v. Regents of University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1977),

*cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977).

**10.** The Court does not address the issue of standing except to note that at least some of the named plaintiffs are real parties in interest for whom a tangible injury has or will occur; compare *Construction Ass'n, of Western Pennsylvania v. Kreps, supra,* 441 F.Supp. at 945–946, and *Associated General Contractors of California v. Secretary, supra,* 441 F.Supp. at 962.

**1024**

quota, the success of the plaintiff on the merits is questionable and the equities favor a denial of the motion.