The MINORITY CONTRACTORS ASSO-
CIATION OF GRAND RAPIDS,
MICHIGAN et al., Plaintiffs,

v.

The CITY OF GRAND RAPIDS, The City of Grand Rapids—County of Kent Joint Building Authority, Incorporated, jointly and severally, Defendants.

No. G79–584 CA 1.

United States District Court,
W. D. Michigan, S. D.

March 31, 1980.

William E. Jackson, George A. Weible, Grand Rapids, Mich., for plaintiffs.

Wallson G. Knack, Philip A. Balkema, Jon F. DeWitt, Grand Rapids, Mich., for defendants.

## OPINION AND ORDER

DOUGLAS W. HILLMAN, District Judge.

This action involves questions about the administration of a federal grant to the City of Grand Rapids and the City of Grand Rapids-County of Kent Joint Building Authority under the Local Public Works Capital Development and Investment Act of 1976, (42 U.S.C. § 6701 et seq.). For the legislative history and the background of this legislation, I refer the reader to *Ohio Contractors v. Economic Development Administration*, 452 F.Supp. 1013 (S.D.Ohio, W.D.1977). No purpose would be served in restating the background of this legislation.

The legislation established a program of federally funded grants for the construction, renovation, repair and improvement of local public works' projects. It was enacted to accomplish initially, at least, a two-fold purpose:

One, to alleviate the problem of national unemployment; and secondly, to stimulate the national economy by assisting the State and local governments in building badly needed public facilities. (HR Rep.No.94. 1077 94th Cong., 2nd Sess.1976, U.S.Cong. & Admin.News pp. 1746–1747).

In 1977, the Public Works Employment Act was amended to include a requirement that all applicants for local public works grants under the Act, give assurance that they would, if awarded a grant, expend 10 percent of the amount of each grant for what is referred to in the Act as "minority business enterprises" (42 U.S.C. § 6705(f)(2)). A "minority business enterprise" is defined as a business at least 50 percent of which is owned by a minority group member, or in the case of a publicly owned business, at least 51 percent of the stock is owned by minority group members. This section was added to increase the involvement of minority businesses in this federally funded grant program and to con-

tribute to the eradication of the effects of past discrimination by providing opportunities to minority businesses to develop technical skills and thereby viable businesses within the construction industry.

The City of Grand Rapids is the grantee for a substantial federal grant under the public works grant program. This LPW grant is in the amount of $4,999,000. The City has provided the grant funds to the City of Grand Rapids-County of Kent Joint Building Authority under a contract for construction of a part of a larger project. That larger project is the Grand Rapids Entertainment Center, or Civic Auditorium Expansion Project. That project is funded by private and other governmental sources of funds in addition to the local public works grant.

The LPW grant was approved by the government on September 20, 1977, and the prime construction contract was awarded to the defendant Owen-Ames-Kimball on July 31, 1978. Presently approximately 50 percent of the construction of the project has been completed.

The plaintiff in this case is an association of minority sub contractors who joined together to bid on the Grand Rapids project. They allege that the defendants in this case have failed to comply with the 10 percent minority business expenditure requirement in the course of construction of the project. They seek to have this court enjoin further work on the project until the City, the Joint Building Authority, and Owen-Ames-Kimball, the prime contractor, comply with that 10 percent set-aside requirement.

For the purpose of obtaining a preliminary injunction to stop the project plaintiff has alleged that one of the MBEs (Minority Business Enterprises), was a "front" and sums paid to him should not be included in the 10 percent set-aside. Before reviewing plaintiff's evidence on this issue it is important to review the requirements essential for the issuance of a preliminary injunction.

A preliminary injunction is an extraordinary remedy. Once issued, it would bring to a complete stop a large public

project which is presently close to completion, before the court has had an opportunity to hear the entire case. That is why a preliminary injunction is an extraordinary remedy. Normally, remedies are granted by a court only after the conclusion of the entire case.

The 6th Circuit has established certain guidelines under which this extraordinary remedy of a preliminary injunction may be granted. When a preliminary injunction is sought the court must analyze the facts and circumstances of the case according to four well settled factors:

(1) whether the plaintiffs have shown a strong or a substantial likelihood or probability of success on the merits;

(2) whether the plaintiffs have shown irreparable injury absent injunctive relief;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) whether the public interest would be served by issuing a preliminary injunction. *Mason County Medical Association v. Knebel*, 563 F.2d 256, (6th Cir. 1977).

First of all, with respect to the irreparable injury alleged by members of the plaintiff association it is claimed that they have been deprived of opportunities to participate in the construction of the project and in the financial benefits of the federal grant awarded by the Economic Development Administration. They argue, and I think correctly, that one of the purposes of the minority set-aside provision in the Act is to provide an opportunity for local minority businesses within the community where the public works project is constructed to benefit by being granted contracts for 10 percent of the Federal grant. This includes an opportunity for them to be given technical assistance by the grantee and the prime contractor. It also anticipated encouragement for the development of those minority businesses within the community as well as help in alleviating minority unemployment.

It has been argued that the 10 percent set-aside should be limited to minority businesses within the local community. It may well be that that was the underlying intent of the Act, as the plaintiff has argued. The law, however, does not specifically so provide. Nor does it in any way provide that if the contract is awarded to minority business enterprises outside of the immediate area, that they would not qualify or that that would be a violation of the law.

The plaintiffs further contend that injury to them, absent an injunction, is irreparable because the experience, the development of skills, the development of the minority businesses as viable experienced entities within their respective trades, cannot be accomplished by the award of damages at a future time. Experience within the trades is crucial to the relief that the plaintiffs claim they are entitled to.

The plaintiffs may well have suffered irreparable harm by not having been awarded subcontracts for work on the project. While this showing is necessary to justify the issuance of a preliminary injunction, it, in and of itself is not sufficient. The four-pronged test, stated earlier, requires that the plaintiffs sustain the burden of showing that they have a strong or substantial likelihood of success on the merits. If these two elements are sufficiently shown, then the test requires that the court exercise its discretion in balancing the four factors and reaching a judgment that the equities either warrant or do not warrant injunctive relief.

Assuming, for argument, that the plaintiffs would be irreparably harmed unless injunctive relief were granted by this court, this does not entitle the plaintiffs to that relief. The award of an interlocutory injunction has never been regarded as a matter of right, even though irreparable injury may result to plaintiff. (*Yakus v. U. S.*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

Turning at this point to the substantive merits of the plaintiffs' claims, this court must determine whether the plaintiffs have sustained their burden of showing a sub-

stantial or strong likelihood of success on the merits. Having heard testimony only on the motion for preliminary injunction and without knowing other evidence that might be introduced at a later date with respect to other subcontractors of Owen-Ames and Kimball, it is obviously difficult for the court to reach a valid judgment on whether the plaintiff is likely to succeed on the merits at the conclusion of this lawsuit.

The plaintiffs have charged that the prime contractor, the defendant Owen-Ames and Kimball entered into subcontracts with one or more minority business enterprises which were not in fact bona fide minority enterprises under the criteria established in the statute. Further, they have specifically attempted to show that the involvement of Ray Builders, the firm holding a subcontract with Owen-Ames and Kimball for roofing on the project, has been less than substantial and has amounted to no more than a "passive conduit" acting on behalf of Great Lakes Systems, an all white owned roofing firm. Finally, the plaintiffs have attempted to show that the Economic Development Administration, the City, and Owen-Ames and Kimball, the prime contractor, failed to properly and adequately monitor the performance of the local public works contract to assure that the commitment of 10 percent expenditures to bona fide minority business enterprises is in fact satisfied.

■ Addressing myself to the latter contention first. I agree with the plaintiff in its assertion that the primary responsibility for monitoring compliance with the minority business participation provision of the statute is on the City of Grand Rapids as the grantee.[1] The Economic Development Guidelines for implementation of the 10 percent MBE rule repeatedly emphasize that it is the grantee who is primarily re-

sponsible for the compliance of the prime contractor in expending sufficient funds for MBE participation. The proofs demonstrate that the City of Grand Rapids and the Joint Authority have failed to fully comply with this responsibility.

The City excluded its own Human Resource Department from monitoring compliance under the grant. It is not exactly clear why the City chose to do that, but, nevertheless, it did. Apparently, it reached that decision in spite of objection to that action by the City Attorney. The Human Resource Department is the department within the City government with personnel who possess experience and training in monitoring affirmative action compliance. The City's decision to exclude the involvement of this department was an error in judgment that began a series of events which led to serious difficulties in contract compliance in this grant under the EDA Guidelines.

■ Similarly, Owen-Ames and Kimball as the prime contractor also had a duty under the LPW grant to provide technical assistance to minority businesses.[2] By accepting these federal monies, Owen-Ames and Kimball took upon itself an obligation to work towards strengthening the long-term and continuing participation of minority businesses in the construction and related industries. The proofs show that Owen-Ames and Kimball did not consistently and actively provide assistance to minority businesses, at least as anticipated under the statute and under EDA Guidelines.

The facts, as demonstrated to this Court by affidavits and testimony, show that the Local Public Works' grant for the Convention Center was slightly less than $5,000,000 and that approximately $518,000 or slightly in excess of 10 percent of the grant has been expended or is contracted to be ex-

---

1. The document entitled "U.S. Dept. of Commerce, Economic Development Administration, Local Public Works Program, Round II, Guidelines for 10% Minority Business Participation in LPW Grants," was introduced as Plaintiff's Exhibit # 2 in the hearing on Plaintiff's Motion for Preliminary Injunction. Those guidelines provide at pages 5, 6 and 8 that it is the

Grantee's responsibility to monitor and assure that the prime contractor fulfills its commitments to expend 10% of the grant funds for minority business participation.

2. See "Guidelines for 10% Minority Business Participation in LPW Grants" at page 3.

pended to what have been identified in the affidavit of Peter Willis, an Assistant City Manager, as eight minority business enterprises.[3] On the proofs to date, all of these business entities have been shown, at least prima faciely, to be bona fide minority business enterprises. The sum of approximately $518,000 has been expended or is contracted to be expended, to these minority business enterprises for the subcontracting of services and supplies utilized in the course of construction of the Convention Center Project. Whether or not any of these contractors or subcontractors other than Ray Builders failed to meet the standards of the statute must be left for further proofs.

With respect to Ray Builders, plaintiff claims and has endeavored to prove, through the testimony of its owner, Reamuless Kyler, that Ray Builders, a wholly owned black business, was not a legitimate MBE but was a "front" only and operated merely as a passive conduit. From the affidavit of Peter Willis it appears that the $123,000 scheduled for the participation of Ray Builders is obviously a substantial part of the over-all 10 percent set-aside for this grant. Mr. Kyler was subpoenaed and appeared in court in Grand Rapids on Friday, January 11. He testified most of that afternoon. Mr. Kyler is a black man, a resident of Detroit, and is the sole owner of Ray Builders, an individual proprietorship located in Detroit, some 150 miles east of Grand Rapids.

Mr. Kyler initially entered into a subcontract with Owen-Ames-Kimball to install roofs on two buildings in the Convention Center Project, the Performing Arts Center and the Exhibitors Center. Only the work performed on the Performing Arts Center is funded by the LPW grant.

Mr. Kyler testified that because of the high cost of Detroit labor, logistics problems in transporting a crew from Detroit to Grand Rapids and the additional expense of travel time that he would be required to pay his crew, he initially had no intentions of performing the work on either the Performing Arts Center or the Exhibitors Center. With the knowledge of the City and the prime contractor, he undertook to subcontract the total contract for roof installation on both structures to Great Lakes Systems, which is a wholly white-owned roofing business in Grand Rapids. It was his testimony that he in fact had checked with the United States authorities in the Economic Development Administration to determine whether his subcontracting this job would or would not comply with the 10 percent set-aside. It was his sworn testimony that he was told that the plan to subcontract the total contract to Great Lakes Systems would satisfy the requirements of the law.

However, a reading of the law and the guidelines demonstrate that this would not have satisfied the minority business participation requirement and would have precluded the total amount of that contract from contribution towards the 10 percent minority participation requirement.

The EDA guidelines require that the involvement of an otherwise qualified minority business enterprise in performance of a contract must be both significant and substantial in order for the minority contract to contribute towards the 10 percent minority participation requirement.[4] These

---

3. Affidavit of Peter Willis in paragraph 11 reads:

"The Project has already had work performed or has contracts with the following MBEs in the following respective amounts, as CONFIRMED by the contractors and MBE subcontractors:"

| | |
|---|---|
| Grandville Electric Co.—foundation phase | $ 10,017 |
| Grandville Electric Co. | 147,000 |
| Wm. Pinkard Plumbing and Heating Supply | 32,745 |
| Ray Builders | 123,000 |
| Interstate Interior Systems | 186,304 |
| F.A.W. | 772 |
| George Williams Excavating | 5,500 |
| Black Satin Co. | 13,000 |
| Total | . $518,338 |

4. See "EDA Minority Business Enterprise Technical Bulletin" issued October 11, 1977, at page 3. "Although an enterprise may qualify as an

guidelines are entitled to substantial deference in interpreting the statute. *Griggs v. Duke Power*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1970); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1974). It is the intent of the EDA to allow credit for the utilization of MBE's only for those contracts in which the "involvement constitutes a basis for strengthening the long-term and continuing participation of the MBE in the construction and related industries."[5] The initial involvement of Ray Builders in the performance of its subcontract fell substantially short of this test.

Apparently, however, in August or September of 1979, after a 40 percent completion review had been conducted by EDA through its Chicago regional offices, Mr. Kyler was informed that his participation in the subcontract was not adequate to satisfy the MBE participation requirement. In response to this concern and opinion of the EDA, Mr. Kyler, the City, and the prime contractor, agreed that Mr. Kyler was to become more directly and actively involved in performance of his subcontract with Owen-Ames and Kimball. The testimony in this court disclosed that he came to Grand Rapids, hired a crew, and that he himself personally supervised the installation of some 445 square feet of the roof on the Performing Arts Center. Great Lakes Systems continued to complete their subcontract for roof installation on the Exhibitors Center. The work being performed by Ray Builders on the Performing Arts Center for $123,000, represents work performed under the LPW grant. The portion of the contract that has been subcontracted to Great Lakes Systems is work on the Exhibitors Center and is not paid for under the LPW grant.

So the question is whether Mr. Kyler is now sufficiently involved in and responsible for performance under the subcontract for installation of the roof on the Performing Arts Center and ultimately responsible for potential liability of that work so that his involvement can reasonably be characterized as both "significant and substantial." How does the court determine whether or not his efforts on this part of the subcontract are both significant and substantial? This determination must be based upon the evidence, that is, the affidavits, exhibits and the sworn testimony of the witnesses. Plaintiffs argue that Ray Builder's work on the subcontract was neither substantial nor significant. The only testimony on that issue has been that of Mr. Kyler himself. It was his sworn testimony on January 11 that at all times when the roof was being installed on the Performing Arts Center, he himself was present to supervise the installation. He testified that the subcontract required a "Carlysle roof", and that he had been trained by the manufacturer in procedures for installation of Carlysle roofs. He testified that he had hired the crew. Further, that a foreman is on the roof at all times, and that he, that is, Mr. Kyler, had the authority and the responsibility to instruct and to advise the foreman on how that roof should be installed. He had the authority to hire or fire workmen that were employed on the job. Ray Builders is completely liable for performance under the contract.

The plaintiffs called no witnesses to counter or rebut this testimony. No testimony was offered by any workmen or the foreman or anyone from Great Lakes to say that Mr. Kyler did not actually have authority to supervise the installation or to hire and fire, or that he was just standing around and that it was Great Lakes that in fact made all of the decisions on the installation of this roof. The court has nothing on this issue before it except the sworn testimony of Mr. Kyler from which to determine the extent and nature of the involvement of Ray Builders on the subcontract.

MBE, in order for the gross amount of a contract for the purchases of services or materials from an MBE to count toward the 10% requirement, the MBE must be significantly and substantially involved in providing the services or materials."

5. Ibid., at page 3.

In spite of the fact that the City as the grantee had the responsibility to monitor the MBE's, nevertheless, it has been the practice of the City to pass that responsibility on to the EDA regional office in Chicago. EDA has offices in Chicago where the EDA Michigan Representative is located. Through their Chicago offices EDA has monitored the MBE participation on this grant. The affidavit of Edward W. Solan, who is employed by the United States Economic Development Administration, as the Michigan Team Leader for EDA-LPW Projects in their Chicago offices is part of this file. In his affidavit dated November 7, 1979, and filed in this court on December 6, 1979, he states: "According to the records maintained in the midwestern regional office of EDA, the City of Grand Rapids is in compliance with the minority business enterprise requirement for said grant under 42 USC, paragraph 6701 and the regulations promulgated thereunder, cited as 13 CFR, chapter 3, section 317."

That is the testimony relevant to the involvement and qualification of Ray Builders under this LPW grant that is before the court. Consequently, based upon that testimony and for the purposes of a preliminary injunction, I find that the involvement of Ray Builders has been both significant and substantial and does in fact meet the test under the guidelines. The amount of Mr. Kyler's subcontract on the LPW grant, that is, $123,000, may be included in the MBE participation to satisfy the 10 percent minority participation requirement under the LPW grant, for purposes of presently evaluating the plaintiff's likelihood of success on the merits.

Despite the fact that there may have been less than 100 percent compliance under the EDA guidelines it cannot be concluded that those breaches have resulted in noncompliance with the statute. Consequently, the court concludes that plaintiff has not sustained its burden of showing a substantial likelihood of success on the merits.

Plaintiff has argued that the 10 percent minority set-aside requirement applies to all federally funded grants contributing to the funding of the Project. This has not been substantiated by any authority.

It is important to bear in mind that no one minority business enterprise has a vested interest in being the business that is granted the contract or a subcontract to perform work under a federally funded public works grant. The plaintiff has argued that given the fact that the project is located in the City of Grand Rapids, the statute implicitly or through a guideline promulgated under it requires that bona fide minority business enterprises within Grand Rapids were intended to benefit from this local public works' grant. I have indicated an agreement generally with the logic of that reasoning. However, I find no requirement in the statute or within the guidelines which specifically directs the grantee or the prime contractor to give an absolute priority to MBE's within the City where the project is under construction.

It is important to note that the minority business set-aside does not require that the prime contractor do away with competitive bidding and that is precisely where members of the plaintiff Association failed to secure a contractual agreement with Owen-Ames and Kimball. The proofs in this case show that Jerome Sorrells, an able, competent and experienced contractor, on behalf of plaintiff submitted bids of eight local subcontractors to Owen-Ames and Kimball to do certain construction on this project. It was on a single sheet of paper.[6] It was the testimony of the defendant Owen-Ames and Kimball that unless each item in the bid was broken down, there was no practical way that it could assess the reasonableness or the competitiveness of the bid. Plaintiff responded by alleging that such a breakdown serves to the benefit of the contractor only by

---

6. That bid was introduced as plaintiff's exhibit number 3, in the hearing on plaintiff's Motion for Preliminary Injunction.

"knocking" down each subcontractor. The court has no way of assessing the validity of this claim. No proofs were submitted that a company's insistence on such a breakdown in the bids was unfair, unbusinesslike or unreasonable. Owen-Ames and Kimball was required by law to have a 10 percent set-aside for minority business participation in this LPW grant. It is inconceivable to the court that it would deliberately put unreasonable roadblocks in the path of local minority business enterprises and then go elsewhere to obtain similar participation. The burden of proof was upon the plaintiff to establish that its bid was proper and reasonable and its refusal by the prime contractor was unreasonable. There was no proof presented to the court on that issue. To the contrary, evidence was offered that the work was in fact obtained by the prime contractor through other bids that were submitted at considerably lower prices.

In addition, the court must make an assessment of the public interests involved and weigh the hardships that foreseeably would result to the defendants and third parties, should an injunction be issued. These considerations must be weighed against the present hardships to the plaintiff. It is this weighing and balancing process which leads the court to conclude that a preliminary injunction should not be granted. This is not a case involving only private interests of the parties. Important public interests play a substantial part in the evaluation of the questions presented by this lawsuit.

The court recognizes the importance of stimulating local black businesses, making them viable, and making them part of the business community. The court also recognizes the seriousness of the public interest involved in achieving that end, as well as the public interest in eradicating the effects of past discrimination. Our heritage of race discrimination is a wrong in which the public is collectively implicated. Because of that, Congress has enacted this minority set-aside requirement in the Public Works Act in an effort to engage communities in effective remedies to reduce the effects of this historic injustice. Here the plaintiffs seek to secure for themselves an opportunity to work and develop viable, stable businesses—a goal that may be difficult for them to achieve, perhaps in part because of race discrimination. The public has a very substantial interest in enabling black businesses to succeed, as they do in all their businesses. Yet, it is important to bear in mind that the Public Works Employment Act itself was enacted to achieve other very important interests, specifically to alleviate the problem of national unemployment and to stimulate the national economy by assisting the state and local governments in building badly needed public facilities.

The plaintiff has argued that the defendants in this case have been guilty of inequitable, if not unlawful, conduct, and that they should be punished. The court, however, must bear in mind that there are at least 150 persons employed on this project by Owen-Ames and Kimball alone at the present time. In evaluating whether to grant or not grant this injunctive relief, the court must look to the impact and the hardship that would be thrust upon those people, should an injunction be granted.

The prime contractor is operating under contractual deadlines for completion of the project. The Exhibition Building was scheduled for completion in early January. The full project is to be completed in August of 1980. The City has entered into contracts with exhibitors for use of the Exhibitor's Building beginning in January. To halt progress on the construction of the project at this juncture would threaten and seriously jeopardize the reputation of the City in the exhibition and convention business. When conventions come to Grand Rapids and spend money here that obviously benefits both the black as well as the white community. In addition, if an injunction were granted by this court, the City would lose many thousands of dollars if it should be compelled to break financial commitments already entered into. It is precisely the public interests which the Act seeks to achieve that would be jeopardized, should injunctive relief be granted. The

**604**

stimulation in the local economy, which the construction and operation of the Convention Center can be expected to bring to Grand Rapids, would be seriously delayed and affect many private interests within this community. The employment of 150 people in the construction trade would be immediately terminated. The intention of the Act was to alleviate unemployment now, not next year, not several months down the road.

There is another factor that I think is fair and legitimate for the court to take into consideration. Plaintiff has waited until, if not the eleventh hour, at least a very late hour to initiate its complaint in this Court. By waiting until this late date, it has raised this controversy at a point where the public interests in timely completion of the project are more acute then they would have been had this question been raised at the conception of this construction venture.

Therefore, in summary, upon careful consideration and weighing of the interests that would be affected by action or inaction of this court, and with consideration for what is believed to be in the best interests of all of the elements in our community, this court holds that the plaintiff has not established its right to temporary injunctive relief, and therefore plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.