**H. Earl FULLILOVE, Fred Munder, Jeremiah Burns, Joseph Clarke, Gerard A. Neuman, William C. Finneran, Jr., Peter J. Brennan, Thomas Clarkson, Conrad Olsen, Joseph DeVitta, as Trustees of the New York Building and Construction Industry Board of Urban Affairs Fund, Arthur Gaffney as President of the Building Trades Employers Association, General Contractors Association of New York, Inc., General Building Contractors of New York State, Inc., and Shore Air-Conditioning Co., Inc., Plaintiffs,**

v.

**Juanita KREPS, Secretary of Commerce of the United States of America, the State of New York, the City of New York, Board of Higher Education and Board of Education of the City of New York and Health and Hospitals Corporation, Defendants.**

No. 77 Civ. 5786 (HFW).

United States District Court,
S. D. New York.

Dec. 19, 1977.

Berman, Paley, Goldstein & Berman, New York City, Doran, Colleran, O'Hara & Dunne, Garden City, N. Y., French, Fink, Markle & McCallion, New York City, for plaintiffs; Robert G. Benisch, New York City, Robert A. Kennedy, Stephen J. Smirti, Jr., Garden City, N. Y., Robert J. Fink, New York City, of counsel.

Louis J. Lefkowitz, New York State Atty. Gen., State of New York, New York City, for defendant; Dominick J. Tuminaro, Arnold Fleischer, Asst. Attys. Gen., New York City, of counsel.

W. Bernard Richland, Corp. Counsel, City of New York, New York City, for defendants City of N. Y. and Bd. of Ed.; Theodore Gilbert, Nathan Ratner, Ellen Kramer Sawyer, Hadley W. Gold, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City by Mary C. Daly, Gaines Gwathmey, III, Gerald Hartman, Dept. of Justice, Washington, D.C., for defendant Secretary of Commerce.

## MEMORANDUM DECISION

WERKER, District Judge.

The plaintiffs in this civil rights action, several associations of construction contractors and subcontractors and a firm engaged in heating, ventilation and air conditioning work, by order to show cause seek declaratory and injunctive relief to prevent the Secretary of Commerce, as the program administrator, and the remaining defendants, as potential project grantees, from enforcing section 103(f)(2) of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2) (the "Act"), which requires 10 percent minority business enterprise participation in any local public works project funded thereunder.[1]  Plaintiffs allege in

---

1. Under section 103(f)(2) of the Act, a minority business enterprise is defined as "a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group

their complaint that section 103(f)(2) of the Act (the "MBE requirement") violates the equal protection clause of the fourteenth amendment and hence also the due process clause of the fifth amendment.[2] Plaintiffs further allege that the MBE requirement is violative of the clear Congressional policy underlying the Civil Rights Acts of 1866 and 1964.

Similar allegations have recently been considered in several other districts.[3] It appears, however, that none of those courts have reached a final decision on the merits and, as a consequence, this may well be the first decision squarely holding that the MBE requirement is an entirely constitutional method of remedying prior acts of discrimination in the construction industry and one which is fully consistent with the civil rights laws that preceded it.[4]

## BACKGROUND

The complaint in this action was filed on November 30, 1977 and an initial hearing on plaintiffs' order to show cause was held the same day. At the close of that hearing, the Court denied plaintiffs' request for a temporary restraining order and, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, set the matter down for a consolidated hearing on the application for a preliminary injunction and trial on the merits the following day. The court further directed that each defendant file a memorandum of law at the time of the preliminary injunction hearing and trial.[5] That proceeding took place on November 31 and December 2, 1977, and further memoranda have since been filed. Although the Secretary has expressed concern about the speed with which this matter proceeded to a trial, that issue, quite obviously, has been mooted by the determination reached herein.

## HISTORY OF THE MBE REQUIREMENT

The Act was passed to extend the provisions of Title I of the Local Public Works Capital Development and Investment Act of 1976, Pub.L. No. 94–369, 90 Stat. 999–1012 (1976), under which Congress appropriated $2 billion to stimulate the national economy and the sagging construction industry by providing direct grants to state and local governments for the construction of public facilities which would immediately

members." Minority group members, are defined as "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts."

2. Although the fifth amendment contains no express equal protection clause, it has been held that the due process clause of that amendment incorporates fourteenth amendment equal protection elements. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

3. *Wright Farms Construction, Inc. v. Kreps*, 444 F.Supp. 1023 (D.Vt.1977); *Ohio Contractors Association v. Economic Development Administration*, No. 77–619 (S.D.Ohio Nov. 22, 1977); *Montana Contractors Association v. Higgins*, 439 F.Supp. 1331 (D.Mont.1977); *Associated General Contractors of Wyoming, Inc. v. Secretary of Commerce*, No. 77–222 (D.Wyo. Nov. 4, 1977); *Florida East Coast Chapter of the Associated General Contractors of America v. Secretary of Commerce*, No. 77–8351 (S.D. Fla. Nov. 3, 1977); *Associated General Contractors of California v. Secretary of Commerce*, 441 F.Supp. 955 (C.D.Calif.1977); *Con-*

*structors Association of Western Pennsylvania v. Kreps*, 441 F.Supp. 936 (W.D.Pa. Oct. 13, 1977).

4. In *Wright Farms, supra*, Judge Coffrin set down a hearing on a preliminary injunction and trial on the merits for December 12, 1977. There is no indication, however, that he has yet issued any opinion following that proceeding.

5. At the time of the initial hearing, plaintiffs had not served the Health and Hospitals Corporation of the City of New York, the New York City Board of Education or the New York City Board of Higher Education, each of which is a separate governmental entity. Accordingly, the Court directed that by 5:00 p. m. the following day each of these defendants be personally served with plaintiffs' complaint and accompanying papers. At the consolidated hearing and trial, Theodore Gilbert, Esq., an Assistant Corporation Counsel for the City of New York, entered an additional appearance on behalf of the Board of Education, but no one has appeared for either the Board of Higher Education or the Health and Hospitals Corporation.

create a substantial number of jobs.[6] See H.R.Rep.No.1077, 94th Cong., 2d Sess. (1976). To assure that the program would actually be of direct benefit to the construction industry, the Act added a requirement that private firms, and not governmental units, perform any work funded. Act § 103(e)(1), 42 U.S.C. § 6705(e)(1); H.R.Rep. No.20, 95th Cong., 1st Sess. 4 (1977). An additional expenditure of $4 billion for construction projects was authorized under section 109 of the Act, 42 U.S.C. § 6708, and Congress subsequently appropriated $2 billion for that purpose under what is commonly known as "Round Two" of the Local Public Works Program. Economic Stimulus Appropriations Act, Pub.L. No. 95–29, 91 Stat. 122, 124 (1977).

When the Act was being considered on the floor of the House, Representative Parren Mitchell of Maryland introduced an amendment subsequently incorporated into the Act as the MBE requirement. See 123 Cong.Rec. H 1437–41 (daily ed. Feb. 24, 1977). That provision, in its present form, reads as follows:

"Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises."

The Secretary of Commerce, pursuant to authority granted her under section 107 of the Act, 42 U.S.C. § 6706, has also promulgated regulations to carry out the terms of the MBE requirement while still affording an escape mechanism to contractors doing business in areas where compliance with the 10 percent set-aside is impossible.[7] Under the regulations, a project *grantee*, not the contractor, can seek a waiver of the MBE requirement when it first applies for a grant or, if necessary, at any later time— provided that sufficient supporting information is furnished to the reviewing officer. See Affid. of M. L. Banner, Chief of the Atlantic Regional Office of the Economic Development Administration, sworn to December 5, 1977. Moreover, the Department of Commerce has issued two sets of interpretive guidelines and a technical bulletin to assist project grantees in their efforts to comply with the MBE requirements.[8]

## DISCUSSION

### A. *Constitutionality of the Act.*

■ The first issue presented to the Court is whether the MBE requirement incorporates a constitutionally impermissible racial or ethnic quota, as plaintiffs suggest,

---

**6.** In the City of New York alone, $193,838,646 has been awarded for 83 projects to be built under the Act. It has been estimated that the New York City projects will generate "approximately 6,348,842 hours of employment, the equivalent of a full year of employment for 5039 construction workers." It is further anticipated that these projects will generate the equivalent of a full year of employment for 1618 workers in construction-related industries. Spending generated by these individuals and their employers is expected to produce at least an additional 18,644 person years of employment. Affid. of Anthony J. Sulvetta, Chief of the Program Analysis Division of the Economic Development Administration, sworn to Dec. 1, 1977, at 2, 4. The impact of Act-funded projects on the national economy is equally dramatic. *Id.* at 4–5.

**7.** The regulations, which appear at 42 Fed.Reg. 27,434–35 (1977) (to be codified in 13 C.F.R. § 317.19), provide in pertinent part as follows:

(b) Minority business enterprise. (1) No grant shall be made under this part for any project unless at least ten percent of the amount of such grant will be expended for contracts with and/or supplies from minority business enterprises.

(2) The restriction contained in paragraph (1) of this subsection will not apply to any grant for which the Assistant Secretary makes a determination that the ten percent set-aside cannot be filled by minority businesses located within a reasonable trade area determined in relation to the nature of the services or supplies intended to be procured.

**8.** Economic Development Admin., U.S. Dep't of Commerce, Guidelines for Round II of the Local Public Works Program (June 1977); Guidelines for 10% Minority Business Participation in LPW Grants (Aug. 1977); Minority Business Enterprise Technical Bulletin (Oct. 1977).

or merely, as defendants argue, a legislative preference intended to remedy the adverse effects of past or present discrimination. Although the Secretary of Commerce steadfastly maintains that the MBE requirement should be considered as a goal which can be waived "where facts show that enforcement would be impractical," [9] Secretary's Memorandum in Opposition to Plaintiffs' Motion at 13, and presumably that it should therefore be subject to some lesser standard, the Court need not enmesh itself in the goal versus quota controversy, for resolution of the constitutional question presented by the plaintiffs would not be advanced one iota by such an exercise. No matter how the MBE requirement is characterized, it cannot be denied that it distinguishes among various business enterprises, at least in part, based upon the racial background of their principals. Consequently, since its operation involves the use of an inherently "suspect" classification, rigid scrutiny of both Congressional purpose and the means selected to effectuate that purpose is clearly mandated. *See Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

Two standards must therefore be met under the traditional formulation. First, the governmental objective advanced by the Act must be shown to serve a "compelling state interest." *See Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); second, defendants must demonstrate that other available means of accomplishing the objective would not, in practice, prove to be less discriminatory.[10] *Dunn v. Blumstein*, 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Loving v. Virginia*, 388 U.S. at 11, 87 S.Ct. 1817; *Associated General Contractors of California v. Secretary of Commerce*, 441 F.2d at 964. It is the Court's view that both of these requirements have been met in this action.

1. *Compelling Interest Analysis.* Plaintiffs concede that "a compelling state interest is present if the racial classification is intended to remedy the vestiges of present and/or past discrimination," Plaintiffs' Memorandum in Support of Preliminary Injunction at 10, but argue that the formal legislative history of the Act is devoid of any indication that Congress wished to assist minorities, rather than economically disadvantaged groups in general. *Id.* at 965. The Congressional purpose underlying enactment of the MBE requirement cannot be discerned merely by examining the reports of the Senate and House committees that considered the Act, however, because the minority business set-aside was not proposed until a relatively late date in the draft bill's history and was therefore never considered by any Congressional committee. *See Associated General Contractors of California v. Secretary of Commerce*, 441 F.2d at 969. Thus, even though the House Public Works and Transportation Committee called for federally financed or assisted

---

**9.** The Secretary's argument is, in this regard, overstated, for waivers are only granted "under exceptional circumstances." Guidelines for 10% Minority Business Participation in LPW Grants, *supra*, at 13. One court has accurately described the waiver criterion as one of practical *impossibility*. *Ohio Contractors Association v. Economic Development Administration*, slip op. at 14.

**10.** The Secretary contends that the proper standard for evaluation of legislative classifications that are inherently suspect has been recently set forth in *In re Griffiths*, 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973), under which the United States need only show:

that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is "necessary to the accomplishment" of its purpose or the safeguarding of its interest. (Footnotes omitted.)

The Supreme Court expressly noted, however, that characterizing the requisite state interest as "overriding" or "compelling" or "substantial" signifies no substantive distinction, *id.* at 722 n. 9, 93 S.Ct. 2851. Furthermore, the Court sees no real difference between the *Griffiths* requirement that the classification be necessary and the concept that the classification must be narrowly drawn. The Court therefore adheres to the more frequently cited rigid scrutiny formula.

public works projects as a "dual purpose instrument to help revitalize the Nation's financially-pressed communities and reactivate the distressed construction industry," H.R.Rep.No.20, 95th Cong., 1st Sess. at 1, there may well be other, equally important reasons for passage of the Act by Congress. As Professor Dickerson has aptly noted, there is frequently "a congeries of purposes" behind a bill. R. Dickerson, The Interpretation and Application of Statutes 89 (1975). It is therefore necessary, in the Court's view, to consider both the "debate rhetoric" surrounding introduction of the MBE requirement and the societal and legislative context within which that provision was meant to operate. *See Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) in which the Court discussed what Congress *might have found* in enacting challenged legislation.

Turning first to the floor debate, the Court finds that the remarks made in support of the MBE requirement indicate an intent to remedy prior wrongs to minority groups, not merely, as plaintiffs contend, a general desire to assist economically pressed construction contractors, subcontractors and vendors. For example, Representative Mitchell noted in his remarks that the federal government's program of assistance to minority business permits them to become "viable entities in our system" only to be "cut off" when contracts are awarded, and he added that "the only way that we are going to get the minority enterprises into our system" is by setting aside funds. 123 Cong.Rec. H 1437 (daily ed. Feb. 24, 1977). Representative John Conyers of New York, who also spoke in favor of the Mitchell amendment, observed perhaps a bit more directly that "minority contractors and businessmen who are trying to enter the bidding process . . . *get the 'works' almost every time.*" *Id.* at H 1440 (emphasis added). *See also* remarks of Representative Biaggi at *id.* ("Nation's record with respect to providing opportunities for minority businesses is a sorry one"); and remarks of Senator Brooke, *id.* at S 3910 (daily ed. Mar. 10, 1977) (noninvolvement of minority business exists despite legislation, executive orders and regulations).

It is true that these statements do not expressly attribute the difficulties encountered by minority business enterprises to prior racial discrimination, but whatever ambiguity is present is easily resolved when the available empirical data is examined. Thus, although the United States has a minority population of approximately 17 percent, only about four percent of all businesses are controlled by members of minority groups, and they account for less than one percent of national gross business receipts. Office of Minority Business Enterprise, United States Dep't of Commerce, Minority Business Opportunity Handbook at I–1 (August 1976) ("Minority Handbook").[11] Minority businesses also receive less than one percent of the $120 billion in government contracts awarded annually. United States Comm'n on Civil Rights, Minorities and Women as Government Contractors 2, 6 n. 10 and 86 (May 1975). Plaintiffs question the soundness of the data contained in the reports relied upon by the Secretary, and point to recent increases in the number of minority businesses and the amount of their dollar receipts,[12] Plaintiffs' Post-Trial Memorandum at 10, but even if the statistics for minority businesses were to be doubled, there would still be an ample basis for Congress to have concluded

---

11. A House committee recently suggested slightly different statistics:

> While minority persons comprise about 16 percent of the Nation's population, of the 13 million businesses in the United States, only 382,000, or approximately 3.0 percent, are owned by minority individuals. The most recent data from the Department of Commerce also indicates that the gross receipts of all businesses in this country totals about $2,540.8 billion, and of this amount only 16.6

billion, or about 0.65 percent was realized by minority business concerns.

Report of the House Committee on Small Business, H.R.Rep.No.1791, 94th Cong., 2d Sess. 124 (1977).

12. Between 1969 and 1972, the number of minority-owned construction firms increased by 34 percent while gross receipts for such firms rose 84 percent. Bureau of the Census, U.S. Dep't of Commerce, 1977 Survey of Minority-Owned Business Enterprises (May 1975).

that "the severe shortage of potential minority entrepeneurs with general business skills is a result of their historic *exclusion* from the mainstream economy." *See* Minority Handbook at I–1–2 (emphasis added).

In fact, it appears that a House subcommittee has made that very finding. In reviewing the record of certain federal programs for minority business enterprises, the House Subcommittee on Small Business Administration Oversight and Minority Enterprise observed that:

The effects of past inequities stemming from racial prejudice have not remained in the past. The Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system.

Report of the House Committee on Small Business, H.R.Rep.No.1791, 94th Cong., 2d Sess. 124 (1977).

The subcommittee furthermore noted that

over the years, there has developed a business system which has traditionally excluded measurable minority participation. In the past more than the present, this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetu-

ate these past inequities. Minorities, until recently, have not participated to any measurable extent, in our total business system generally, or in the construction industry, in particular.

*Id.* at 182.

Where there is, as here, a statistical disparity between the representation of minority groups in the general population and the degree of their involvement in economic activity, the Court believes that Congress could reasonably believe that prior racial discrimination was the cause.[13] *See, e. g., Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768, 45 U.S.L.W. 4882 (U.S. June 28, 1977); *Constructors Association, of Western Pennsylvania v. Kreps,* 441 F.Supp. 936. However, even if the members of Congress were not aware of the relevant statistical information at the time that they adopted the MBE requirement, certainly they must have acted with knowledge of the many federal antidiscrimination measures implemented over the past several years.[14] When the Mitchell amendment is considered against the background of those programs, it becomes rather obvious that the MBE requirement was incorporated into the Act after only brief debate because of a general awareness of the compelling need for legislative action capable of overcoming the effects of prior discrimination against minority businesses seeking to participate in government contracting.[15]

**13.** Plaintiffs contend that under *Equal Employment Opportunity Commission v. Local 14,* 553 F.2d 251, 255 (2d Cir. 1977), the Secretary should only be entitled to marshal post-1965 statistics since Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d and 2000e *et seq.*, were not effective prior to then. The question before the Court, however, is what Congress could rightfully infer as to the reason for the poor showing of minority enterprises in our national economy; passage of the Civil Rights Act of 1964 is entirely irrelevant in that regard.

**14.** Judge Snyder catalogued many of the federal programs in *Constructors Association of Western Pennsylvania v. Kreps,* op. at 951 n. 8, and the reader is referred to that source for a summary description of the federal effort. The Secretary maintains that there are some 35

federal assistance programs designed particularly for minority enterprises. *See* Office of Minority Enterprise, U.S. Dep't of Commerce, Federal Assistance Programs for Minority Business Enterprises (1977).

**15.** Plaintiffs contend that the federal amelioratory scheme consists of remedies, which "cannot be substituted for the necessary clear basis of legislative findings and reliance to validate this act." Plaintiffs' Post-Trial Memorandum at 13–14. However, the critical issue before the Court is not whether Congress, in enacting the MBE requirement into law, actually made an express finding that there was prior racial discrimination in the construction industry; the issue, more properly, is whether such a finding would have been justified. As the Supreme Court noted in *Katzenbach v. Morgan,* 384 U.S. 641, 653, 86 S.Ct. 1717, 1725, 16 L.Ed.2d 828

None of the evidence introduced at the hearing held in this matter even remotely suggests a contrary conclusion. At best, the testimony shows that construction contractors in the New York City area have not engaged in any concerted effort to discriminate against minority subcontractors and venders.[16] Although a host of labor union discrimination cases make that proposition rather dubious,[17] even if it were to be accepted, *arguendo*, based upon the disgraceful record of minority enterprise involvement in our national economy, Congress could still find that racial discrimination against minority businesses remained a serious problem in many *other* areas of the country. And as even plaintiffs have admitted, that is a problem the federal government certainly has a compelling interest in resolving.

2. *Effective yet narrowly drawn means.* The critical question therefore becomes whether Congress adopted the least discriminatory method of accomplishing its concededly legitimate objective. In this regard, plaintiffs urge that the defendants could achieve the apparent purpose of Congress, with less imposition on nonminority persons, through greater use of (1) cash advances to minority contractors pursuant to 41 C.F.R. § 1–30.400 *et seq.* (1977), and (2) section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), under which government procurement contracts are let to the Small Business Administration and are then fulfilled through noncompetitive subcontracts to "small business concerns owned and controlled by socially or economically disadvantaged persons." *See* 13 C.F.R. § 124.8–1(b) (1977). Plaintiffs further contend that a

(1966), "any contrary conclusion would require us to be blind to the realities familiar to the legislators." *Cf. Ohio Contractors Association v. Economic Development Administration,* slip op. at 17 (Court need not explore whether particular legislative act in question actually serves compelling interest so long as it falls within confines of well-established state interest.

16. Plaintiffs proffered the testimony of two construction contractors whose firms had submitted bids for projects funded under the Act. Both witnesses stated that their firms had been the successful bidder on projects requiring minority business enterprise participation and intended to submit further bids for additional Act-funded projects; that the 10 percent MBE requirement made it necessary for them to deal with minority subcontractors and venders whom they would not otherwise employ in connection with specified projects; and that they had each used minority venders or subcontractors on previous projects even though that was not required by the bid specifications for those projects. The sole witness for the Secretary was an Assistant Commissioner of the New York State Commission on Human Rights who, in essence, conceded on cross examination that he knew of no concerted effort by construction contractors to discriminate against minority business enterprises in the City of New York.

One of the construction contractors testified that he was meeting the MBE requirement for construction of a tide gate regulator by purchasing the mechanical equipment at somewhat increased cost from a minority vender, rather than acquiring it directly from the manufacturer as he normally would. Transcript at 39–40. At the time of the hearing, the Court

was rather critical of this practice, which it suggested really amounted to incorporation of a welfare program within a public works project. Transcript at 66. According to the Secretary's published guidelines, however, "only the commission or fee earned by the MBE may be counted toward the 10% requirement" when the MBE "acts merely as an agent or a relatively passive conduit in connection with the provision of services or materials." Indeed, "even this commission or fee will not be counted if the MBE performs no substantive services and is a totally passive conduit." Minority Business Enterprise Technical Bulletin, *supra,* at 3–4. This restriction may make it even more difficult for nonminority contractors to comply with the MBE requirement but it certainly resolves any concern the Court may have had over possible squandering of federal funds. Furthermore, the restriction increases the likelihood that minority firms will be involved in large-scale construction projects in a meaningful way.

17. *E. g., EEOC v. Local 638,* 401 F.Supp. 467 (S.D.N.Y.1975), *modified,* 532 F.2d 821 (2d Cir. 1976), *aff'd after remand,* 565 F.2d 31 (2d Cir. 1977); *United States v. Local 638, Enterprise Association Steamfitters,* 360 F.Supp. 979 (S.D. N.Y.1973), *modified sub nom. Rios v. Enterprise Association Steamfitters, Local 638,* 501 F.2d 622 (2d Cir. 1974); *United States v. Local 638, Enterprise Association Steamfitters,* 347 F.Supp. 169 (S.D.N.Y.1976); *United States v. Wood Wire & Metal Lathers, Local 46,* 341 F.Supp. 694 (S.D.N.Y.1972), *aff'd,* 471 F.2d 408 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973).

set-aside for all disadvantaged enterprises would be a less onerous method of remedying the problem of prior racial discrimination. The record presently before this Court establishes, however, that the section 8(a) program has not been an effective remedy. *See* Minorities and Women as Government Contractors, *supra*, at 35–62. And the record further demonstrates that programs designed to provide minority businesses with additional capital through loans or advances are incapable of making them full participants in our economy since construction contractors clearly prefer to deal with firms that have an established track record. *See* Transcript at 18, 51. Yet without mandated opportunities to participate in large scale construction contracts, minority businesses are not in a position to develop such credentials and, therefore, are not likely to garner a greater share of government contracts. As one of the witnesses at trial put it:

> It gets to be a vicious cycle because the insurance companies and the banks will not cooperate with them if they don't have an established track record. They can not [*sic*] establish a track record if they don't get a chance to perform.

Transcript at 82. Expanding the set-aside to include all economically disadvantaged groups is also no answer to the problem, for in our present economy all construction firms are economically disadvantaged and redefining the set-aside to include them all would consequently be tantamount to striking it from the legislation entirely.

Plaintiffs make the further argument that any MBE requirement should be limited to a percentage "commensurate with the present minority participation in the economy." Plaintiffs' Post-Trial Memorandum at 15. The basis for this contention is apparently that the United States Commission on Civil Rights has only set the following goal for the federal government:

> Within the next 5 years, the Federal Government should increase the annual dollar volume of its contracts and subcontracts with minority males, minority females and nonminority, female-owned firms to an amount at least equal to their representation in all American businesses.

Minorities and Women as Government Contractors, *supra*, at 129.

It is not clear whether plaintiffs would want the MBE requirement reduced to a tenth of its present scope to reflect more accurately the degree to which minority businesses actually participate in the United States economy or would be content merely to have it halved to approximate the percentage of minority enterprises that presently exist; nevertheless, the suggestion is absurd in either case.

In the first place, since the Act accounts for less than four percent of annual government contracting, the Commission's goal would not be met even if the MBE requirement were readjusted to require that 90 percent of all Act funds be spent through subcontracts with minority enterprises. Secondly, as Judge Snyder noted in *Constructors Association of Western Pennsylvania v. Kreps*:

> [T]he 10% figure is a reasonable one. Although the minority population is about 17%, the 10% figure is justifiably below that percentage, given their 1% past participation in the construction industry, and is not a concealed limitation on them. Since the program is short-term, there is no danger that the 10% requirement would become in practice a limitation of 10% once minority businesses have become established and competitive. On the other hand, the 10% requirement applies only to the extent local projects are funded by grants under [the Act] and is not overly intrusive on non-minorities. It is not a requirement that projects receiving federal funds assure that 10% of the *project* funds be given to minority businesses. Nor does it attempt to create an overall 10% requirement for the construction industry as a whole. These public works funds are intended to boost the construction industry by channeling extra funds into one aspect of the industry. A set-aside of 10% of these remedial funds for an additional remedial purpose is not unreasonable, especially given the availa-

bility of a waiver to the extent the 10% objective is unobtainable.

441 F.Supp. at 953.

Moreover, since the MBE requirement is subject to a December 31, 1978 cut-off date, Congress will have to demonstrate continued compelling need in order for it to be extended beyond that time. Whether such need exists can then be determined through examination of readily available statistics, *id.,* at 953, including presumably updated Census Bureau data. *See* Survey of Minority-Owned Business Enterprises, *supra,* at 1.

Any reduction in the percentage of minority business participation required under the Act would, of course, result in reduced channelling of funds to the detriment of nonminority businesses and therefore less discriminatory impact. *See Ohio Contractors Association v. Economic Development Administration,* slip op. at 20. Nevertheless, the Court believes that requiring that 10 percent of all grant funds awarded under the Act be set aside for minority contractors or venders cannot be considered unreasonable in view of the consistent failure of less intrusive attempts to nurture the growth of minority enterprises. The Court accordingly finds that the MBE requirement in its present form is necessary for the accomplishment of Congress' goal of promptly alleviating the handicap imposed upon minority businesses due to the lingering effects of discriminatory conduct in the construction industry, and plaintiffs' first two causes of action are dismissed.

### B. *The Statutory Question.*

■ Plaintiffs raise a further claim that the MBE requirement violates various provisions of the Civil Rights Act of 1866 and 1964.[18] The Court does not believe, however, that there is any inconsistency between the requirements imposed by virtue of the Civil Rights Acts and the course of conduct mandated by the MBE requirement. *See Constructors Association of*

*Western Pennsylvania v. Kreps,* at 954. Indeed, it defies credulity to argue that measures intended to correct the invidious effects of racial discrimination must be limited to remedies which are not race sensitive, for minority groups would forever be frozen into the status quo if that were the intent of the Civil Rights Acts. *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159, 173–74 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). Even more importantly, the host of cases permitting racially sensitive remedies for prior discriminatory acts totally belies plaintiffs' argument. *See, e. g., United Jewish Organizations v. Carey,* 430 U.S. 144, 161, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Associated General Contractors of Massachusetts v. Altshuler,* 490 F.2d 9, 16–17 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974) (and cases cited therein). As the Court of Appeals for the Second Circuit has observed, racial classification is frequently impermissible not because it is a *per se* violation of the Constitution, but because it has been drawn for the purpose of maintaining racial inequality. Where, on the other hand, it is employed to effect equality, it is clearly proper. *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 931–32 (1968). It may well be that the Supreme Court's impending decision in the *Bakke* case [19] will necessitate some reevaluation of "reverse discrimination" actions such as this one, but it is not the role of this Court to follow the law as superior tribunals might delineate it at some time in the future. The Court therefore holds that the MBE requirement accords with the intent of the Civil Rights Acts and rejects plaintiffs' statutorily-based contentions.

### SUMMARY

In conclusion, the court holds that defendants have sustained their burden of establishing the constitutionality of the

---

18. 42 U.S.C. §§ 1981, 1983 and 1985 (1970); 42 U.S.C. §§ 2000d and 2000e *et seq.* (1970).

19. *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977).

MBE requirement. Plaintiffs' request for a preliminary injunction and declaratory relief is denied, the Secretary of Commerce's motion for a directed verdict is granted and the complaint is dismissed in its entirety.

SO ORDERED.